**SMITH'S MANAGEMENT CORP., d/b/a Smith's Food King and Smith's Food & Drug, Plaintiff-Appellee,**

v.

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION NO. 357, Defendant-Appellant.**

No. 83–2299.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 13, 1983.

Decided June 13, 1984.

As Modified July 26, 1984.

Max Schneier, Marina del Rey, Cal., for defendant-appellant.

William S. Estabrook, Washington, D.C., for plaintiff-appellee.

Before HUG, PREGERSON, and NORRIS, Circuit Judges.

NORRIS, Circuit Judge:

The question in this case is whether the district court violated the anti-injunction provisions of the Norris-LaGuardia Act, 29 U.S.C. §§ 101–115 (1982), in issuing a preliminary injunction restraining the International Brotherhood of Electrical Workers, Local Union No. 357 (the "Union"), from engaging in a secondary boycott against Smith's Management Corporation ("Smith's"), the operator of Smith's Food King markets in Las Vegas, Nevada.[1] The Union was involved in a dispute with Desert Valley Electric, a non-union subcontractor hired by the developer of a shopping center to do the electrical work on a new market to be leased by Smith's. The Union distributed handbills asking Smith's customers not to patronize Smith's markets because Smith's had failed to ensure that the new market would be built by union labor.

This court has jurisdiction of this appeal under 28 U.S.C. § 1292(a)(1) (1982). We conclude that the issuance of the injunction violated the Norris-LaGuardia Act.

I

The district court held that the anti-injunction provisions of the Norris-LaGuardia Act did not prevent the court from issuing injunctive relief because the controversy between Smith's and the Union did not grow out of a "labor dispute" as defined by section 13(c) of that Act, 29 U.S.C. § 113(c).[2] The district court found there was no labor dispute in this case because the Union is not attempting to organize or to negotiate for Smith's employees and because Smith's and Desert Valley Electric are in "no wise substantially aligned ... in any economic way or ... in any other way." On appeal, the determination of whether such a "labor dispute" exists in the present case "is a question of law which the court must answer from the whole record." *Hasbrouck v. Sheet Metal Workers Local 232*, 586 F.2d 691, 694 (9th Cir.1978).

The Union is engaged in a dispute with the subcontractor, Desert Valley Electric, over that subcontractor's refusal to employ union labor. This controversy— whether the subcontractor will remain a non-union employer—is plainly one which concerns "the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment." 29 U.S.C. § 113(c). As such, it is a "labor dispute"

1. Pointing to the various state tort claims included in the complaint, Smith's argues that the Norris-LaGuardia Act is not applicable when a federal court bases equitable relief on state law claims over which the court has pendent jurisdiction. In this case, however, the district court relied upon section 303 of the Labor Management Relations Act, 29 U.S.C. § 187, as the source of its authority to issue the preliminary injunction. No mention is made of Smith's state law claims in the court's findings of fact and conclusions of law.

2. Section 4 of the Norris-LaGuardia Act, provides in part:

No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in *any case involving or growing out of any labor dispute* to prohibit any person or persons participating or interested in such dispute ... from doing, whether singly or in concert, any of the following acts:

... (e) Giving publicity to the existence of, or the facts involved in, *any labor dispute* ....

29 U.S.C. § 104 (emphasis added).

Section 13(c) of the Norris-LaGuardia Act provides:

(c) The term "labor dispute" includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

29 U.S.C. § 113(c).

within the meaning of the Norris-LaGuardia Act.

The Union's handbilling of Smith's customers is expressly intended to influence the outcome of the Union's labor dispute with Desert Valley Electric.[3] Such "pressure tactically directed toward a neutral employer in a labor dispute not his own," is, of course, the "central aspect" of the classic secondary boycott. *National Woodwork Manufacturer's Association v. NLRB*, 386 U.S. 612, 623, 87 S.Ct. 1250, 1257, 18 L.Ed.2d 357 (1967). There is no question that under the Norris-LaGuardia Act a secondary boycott can be found to involve or grow out of a labor dispute. *Id.; United States v. Hutcheson*, 312 U.S. 219, 231, 61 S.Ct. 463, 465, 85 L.Ed. 788 (1941); *California Association of Employers v. Building & Construction Trades Council*, 178 F.2d 175, 179 (9th Cir.1949). The Supreme Court has noted that in the Norris-LaGuardia Act, "Congress abolished, for purposes of labor immunity, the distinction between primary activity between the 'immediate disputants' and secondary activity in which the employer disputants and the members of the union do not stand 'in the proximate relation of employer and employee ....'" *National Woodwork Manufacturers Association v. NLRB*, 386 U.S. at 623, 87 S.Ct. at 1257 (citation omitted). There is also no doubt that "[s]ale by a merchant of non-union commodities is ... a traditional source of labor disputes within the scope of the Norris-LaGuardia Act." *Bakery Sales Drivers Local Union No. 33 v. Wagshal*, 333 U.S. 437, 444, 68 S.Ct. 630, 633, 92 L.Ed. 792 (1948).

The Union here is acting against a secondary employer, Smith's, in an effort to promote the interest of the members of the Union in a contest with a primary employer, Desert Valley Electric, over terms and conditions of employment. Accordingly we hold that this secondary boycott grows out of or involves a labor dispute and that the preliminary injunction was therefore issued in violation of the Norris-LaGuardia Act.

We reject Smith's argument that the dispute between the Union and Smith's remains outside the scope of the anti-injunction provisions of the Norris-LaGuardia Act because of the supposedly tenuous nature of the relationship between Smith's, as lessee of a market, and Desert Valley Electric, as subcontractor. Citing secondary boycott decisions of other circuits, Smith's contends that federal courts will not find that a secondary boycott has grown out of a labor dispute unless the primary employer and the secondary employer are in fact economically aligned in some substantial manner. *See, e.g., Ashley, Drew & Northern Ry. v. United Transportation Union,*

---

**3.** The handbill distributed by the Union from July 13 to July 21, 1983, reads:

PLEASE DO NOT PATRONIZE

Do not allow Smith's Food King to use your hard earned money to undercut the wage standard of our community.

Smith's Food King has begun using the hard earned dollars you spend at Smith's Food King to pay a construction company that is undercutting the wage standard of this community. Desert Valley Electric pays its workers far below the prevailing wage and benefits for electricians in Southern Nevada.

We believe that any effort to destroy wage standards of any worker can spread over the community and affects all workers—including you.

IBEW Local Union No. 357 is appealing only to the public—you, the consumer.

We are not seeking to induce any person to cease work or to refuse to make deliveries.

The handbill distributed by the Union from July 21, 1983, reads:

PLEASE DO NOT PATRONIZE

Do not allow Smith's Food King to use your hard earned money to undercut the wage standards of our community.

Smith's Food King has displayed its indifference to the maintenance of the wage standards of this community by failing to ensure that the construction made possible by its lease at Henderson Shopping Village is performed by contractors paying prevailing wage rates. Desert Valley Electric pays its workers far below the prevailing wage and benefits for electricians in Southern Nevada.

We believe that any effort to destroy the wage standards of any worker can spread over the community and affect all workers—including you.

IBEW Local Union No. 357 is appealing only to the public—you, the consumer.

We are not seeking to induce any person to cease work or to refuse to make deliveries.

625 F.2d 1357 (8th Cir.1980); *Brotherhood of Railroad Trainmen v. Atlantic Coast Line R.R.*, 362 F.2d 649 (5th Cir.), *aff'd by an equally divided Court*, 385 U.S. 20, 87 S.Ct. 226, 17 L.Ed.2d 20 (1966). Because the premise of this rule is that "the scope of Norris-LaGuardia's protection is determined by the union's self interest," *Ashley, Drew & Northern Railway v. United Transportation Union*, 625 F.2d at 1365 n. 10, a case is considered to involve or grow out of a labor dispute "only when the offending activity is furthering the union's economic interest in a labor dispute." *Id.* at 1363. Under the "economic self-interest test" of the Fifth and Eighth Circuits, a union engaging in a secondary boycott is furthering its economic self-interest only if the secondary employer is "substantially aligned" with the primary employer. *Id.* at 1364.

When applying the "economic self-interest" test, courts assess for themselves the degree of "alignment" between employers. The "substantial alignment" inquiry, in fact, requires that the court decide whether the union's secondary target *actually* possessed sufficient economic power over the primary employer to affect the outcome of the underlying labor dispute. The Union's belief in the efficiency of a secondary boycott is irrelevant to this inquiry. Thus, the Fifth Circuit found that the operator of a railroad terminal picketed by a union engaged in a labor dispute with a railroad could not obtain injunctive relief because the railroad received services from the terminal that *"in fact* constitute[d] an integral part of [the struck railroad's] day-to-day operations." *Brotherhood of Railroad Trainmen v. Atlantic Coast Line R.R.*, 362 F.2d at 651 (emphasis in original). On the other hand, in *Ashley, Drew & Northern Railway v. United Transportation Union*, the Eighth Circuit found that an injunction could issue against the union because the union failed to present evidence showing that the target of the secondary picketing, Ashley, Drew & Northern Railway, the operator of a rail yard, had any substantial connection with the primary employer, Rock Island Railroad.

625 F.2d at 1364–65. In fact, courts have found "substantial alignment" between employers only when the secondary employer provides the primary employer with essential services or facilities, participates in a joint strike insurance plan, or has some other "significant commonality of interest" with the primary employer. *Id.* at 1363–65 (citing cases). *See, e.g., Amalgamated Association of Street Employers v. Dixie Motor Coach Corp.*, 170 F.2d 902 (8th Cir. 1948). Smith's urges that under this "economic self-interest" test, no labor dispute exists in this case, because "[i]t is difficult to emphasize too much the absolute absence of *any* relationship between Smith's and Desert Valley Electric."

Mindful that "the term 'labor dispute' must not be narrowly construed," *Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Association*, 457 U.S. 702, 712, 102 S.Ct. 2673, 2681, 73 L.Ed.2d 327 (1982), we reject the "economic self-interest test" applied by the Fifth and Eighth Circuits and urged upon us by Smith's. We decline to adopt a rule which would exclude a secondary boycott from the anti-injunction provisions of the Norris-LaGuardia Act simply because the union is unable to establish that the secondary employer is in fact "substantially aligned" with the primary employer. Such a rule puts the courts in the untenable position of second-guessing a union as to the effectiveness of a particular boycott in achieving a union's goals.

In those cases where the Supreme Court has held that a controversy between a labor organization and an employer did not involve or grow out of a "labor dispute," it has determined that the controversy was not in fact a dispute affecting the employer-employee relationship, but rather was a dispute upon which the employer-employee relationship had no bearing at all. The Supreme Court has not narrowed the definition of the term "labor dispute," nor has the court made that definition turn on detailed judicial fact-finding relating to the economic effectiveness of a particular boycott. Rather, the Court has simply made

clear that "the protections of ... [the Norris-LaGuardia] Act do not extend to labor organizations when they cease to act as labor groups or when they enter into illegal combinations with non-labor groups in restraint of trade." *Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Association,* 457 U.S. at 714, 102 S.Ct. at 2682 (footnote omitted).

In *Columbia River Packers Association, Inc. v. Hinton,* 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750 (1942), for example, where the union acted as agent for its members in negotiating contracts for those members' sales of fish to canners and processors, the Court held that there was no "labor dispute" involved because the controversy was actually "a dispute among businessmen over the terms of a contract for the sale of fish, not a controversy over "terms or conditions of employment." *Id.* at 415; *see also American Federation of Musicians v. Carroll,* 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968).

Thus, the Supreme Court has not fashioned a narrowing "substantial alignment/economic self-interest" test reserved exclusively for resolving the special problem of whether a secondary boycott involves or grows out of a "labor dispute." Smith's relies on *Bakery Sales Drivers Local Union No. 33 v. Wagshal,* 333 U.S. 437, 68 S.Ct. 630, 92 L.Ed. 792 (1948), to support its argument that because of the supposed lack of economic alignment between Smith's and Desert Valley Electric, the controversy between Smith's and the Union does not involve or grow out of a labor dispute. Smith's reliance on *Wagshal* is misplaced. As the Supreme Court has recently noted, the Court held in *Wagshal* "only that a controversy between two businessmen over the delivery times or methods of payment does not become a labor dispute merely because a union representative, with or without his employer's consent, sought to obtain payment pursuant to a particular method." *Jacksonville Bulk*

Terminals v. International Longshoremen's Association, 457 U.S. at 713–14 n. 13, 102 S.Ct. at 2681 n. 13.

Here, there can be no question that the underlying controversy between the Union and Desert Valley Electric is a labor dispute. Nor can it be doubted that the Union's handbilling of Smith's customers is designed to influence the outcome of that labor dispute. Our inquiry need go no further. We hold that this case grows out of a "labor dispute" within the meaning of section 13(c) of the Norris-LaGuardia Act, 29 U.S.C. § 113(c). The district court therefore had no jurisdiction to issue the preliminary injunction.

The preliminary injunction is VACATED and this case is REMANDED to the district court for further proceedings.[4]

---

**4.** Because we hold that the Norris-LaGuardia Act bars the preliminary injunction issued in this case, we need not reach the question wheth-

er the preliminary injunction unconstitutionally abridged the Union's first amendment right to free speech.