**BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES, Plaintiff,**

v.

**ASSOCIATION OF AMERICAN RAILROADS, et al., Defendants.**

**ALTON AND SOUTHERN RAILWAY COMPANY, et al., Plaintiffs,**

v.

**BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES, et al., Defendants.**

**CENTRAL VERMONT RAILWAY, INC., Plaintiff,**

v.

**BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES, et al., Defendants.**

Civ. A. Nos. 86–0951, 86–0977 and 86–1141.

United States District Court, District of Columbia.

April 25, 1986.

John O'B. Clarke, Jr., Thomas P. Murphy, Kimberly A. Madigan and Charles M. Steele, Highsaw & Mahoney, Washington, D.C. (Louis P. Malone, III, General Counsel, Broth. of Maintenance of Way Employees, of counsel), for plaintiff Broth. of Maintenance of Way Employees.

William J. Curtin, Harry A. Rissetto and Thomas E. Reinert, Jr., Morgan, Lewis & Bockius, Washington, D.C., for defendants Ass'n of American Railroads and American Short Line Railroad Corp.

Edward A. Brill, Proskauer, Rose, Goetz & Mendelsohn, New York City, and Mary P. Sclawy, Detroit, Mich., for plaintiff Central Vermont Railway, Inc.

## OPINION

HAROLD H. GREENE, District Judge.

Plaintiff, Central Vermont Railway, Inc. (CVR),[1] has moved for a preliminary injunction[2] barring defendant Brotherhood of Maintenance of Way Employees (BMWE) and its employees from picketing plaintiff's rail yards in New England. Resolution of the motion presents issues of some difficulty, for it requires the Court to reconcile the apparently conflicting goals and purposes of two statutes: the Norris-LaGuardia Act, 29 U.S.C. § 107, which bars the courts from enjoining labor disputes, and the Railway Labor Act, 45 U.S.C. §§ 151–160, which mandates that railroad employers and employees engaged in a labor dispute must exhaust certain statutory remedies before resorting to self-help and, implicitly, that the assistance of the courts' injunctive power may be called upon to that end.

I

The dispute here has its genesis in a breakdown of contract negotiations between BMWE and two New England-based railroad companies, the Maine Central Railroad Company and Portland Terminal Company. Employees of Maine Central and Portland Terminal have been on strike since early March, and in response to that strike, Maine Central and Portland Terminal locked out their BMWE members. Since April 9, 1986, the BMWE has sought to enhance the bargaining position of its striking members by picketing the rail yards of various rail carriers doing business with the two struck carriers. Counsel for the BMWE candidly concede that the pickets' purpose is to discourage the carriers from doing business with the struck

1. Civil Action No. 86–1141, *Central Vermont Railway, Inc. v. Brotherhood of Maintenance of Way Employees, et al.,* 639 F.Supp. 220, was consolidated by the Court on oral motion of the parties with C.A. Nos. 86–0951 and 86–0977. The case involving CVR and the union was initially filed on April 13, 1986 in the U.S. District Court for the District of Vermont (Judge Billings). That court issued a temporary restraining order and referred the case to a magistrate. The magistrate held an evidentiary hearing on April 17 and he ultimately recommended that the TRO be dissolved and a preliminary injunction denied. On April 22, 1986, Judge Billings dissolved the TRO and ordered the case transferred to this Court.

2. At the Court's suggestion, and with the agreement of both parties, a hearing held on April 23, 1986, was transformed from one on plaintiff's request for a temporary restraining order to one on the request for a preliminary injunction. The Court indicated that the several requests for temporary restraining orders (*see infra*), which were likely to be repeated as additional railroads became involved with the union's activities, created an impractical situation where short-term decisions were being made without a final decision ever being reached. Moreover, the Court's decision on the motion for preliminary injunction, unlike one on a request for a TRO, would be appealable by the losing party.

railroads and from moving their trains and freight over the struck carriers' lines, thereby to bring economic pressure to bear on the Maine and Portland companies to agree to a settlement favorable to the union.

A large number of railroads from across the nation that had become targets of BMWE's secondary picketing campaign have previously sought a temporary restraining order from this Court enjoining the picketing as illegal. On that occasion [3] the railroads failed to show that the pickets had disrupted rail traffic or were likely to do so in the immediate future.[4] Accordingly, exercising caution in this delicate field, the Court denied injunctive relief, holding that the railroads had not established the requisite irreparable harm. *WMATA v. Holiday Tours*, 559 F.2d 841 (D.C.Cir. 1977).[5] CVR, by contrast, has established that BMWE's picketing has virtually closed down the operations of that particular railroad. On that basis, the Court can and must now for the first time address the merits of the underlying controversy.

## II

■ The Norris-LaGuardia Act, 29 U.S.C. §§ 101–115, generally bars the courts from issuing an injunction in any "case involving or growing out of a labor dispute." *See* 29 U.S.C. § 107. A labor dispute is "any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." 29 U.S.C. § 113(c). Although the Circuits are in disagreement regarding the proper test,[6] this Court is persuaded, for the following reasons, that the dispute between CVR and BMWE is a "labor dispute" within the meaning of the Norris-LaGuardia Act under any appropriate construction of the statute.

First, it is necessary to bear in mind the Supreme Court's pronouncement that "the term 'labor dispute' must not be narrowly construed." *Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Association*, 457 U.S. 702, 712, 102 S.Ct. 2672, 2680, 73 L.Ed.2d 327 (1982). As the court there said, "the language is broad because Congress was intent upon taking the federal courts out of the labor injunction business except in ... very limited circumstances." 457 U.S. at 712, 102 S.Ct. at 2680 (quoting *Marine Cooks & Stewards v. Panama S.S. Co.*, 362 U.S. 365, 369, 80 S.Ct. 779, 783, 4 L.Ed.2d 797 (1960)).

Second, the Court concludes that this case is similar to *Smith's Management Corp. v. IBEW*, 737 F.2d 788 (9th Cir.1984), where the court held that a union boycott against certain food markets, designed to

---

3. The request for a TRO was made late in the afternoon on April 9, 1986, and, following a two-hour hearing, the Court's ruling was delivered from the bench in the early morning hours of April 10.

4. Indeed, the Court was advised in subsequent proceedings that this prediction was borne out by events: the effect of the union's picketing activities on railroad operations in such places as Los Angeles and Cleveland had been minimal or non-existent.

5. *See also*, note 20, *infra*. Subsequently, on April 11, 1986, BMWE filed its own request for a TRO, seeking an order to preclude the plaintiff railroads from seeking injunctive relief in other federal courts. In fact, it appeared that several railroads had done just that. This Court, again in order to refrain from exacerbating a sensitive problem, refused to issue such an injunction, leaving the matter to the decision of the courts in which competing injunctive requests had been or would be filed.

It appears that, to date, several district courts have granted TROs against picketing by the BMWE and that others have refused to issue such orders. One court issued a preliminary injunction against picketing on April 24, 1986, applicable to the Burlington Northern railroad. *See* note 17, *infra*.

6. *Compare Smith's Management v. International Brotherhood of Electrical Workers*, 737 F.2d 788 (9th Cir.1984), with *Ashley, Drew & Northern Ry. Co. v. United Transportation Union*, 625 F.2d 1357 (8th Cir.1980), and *Brotherhood of R.R. Trainmen v. Atlantic Coast Line R.R.*, 362 F.2d 649 (5th Cir.), *aff'd by equally divided Court*, 385 U.S. 20, 87 S.Ct. 226, 17 L.Ed.2d 20 (1966).

bring economic pressure upon a shopping center developer who was constructing space for a new food market owned by the operator of the boycotted markets, constituted a labor dispute under 29 U.S.C. § 107. The Ninth Circuit found that "[t]he Union ... [was] acting against a secondary employer ... in an effort to promote the interest of the members of the Union in a contest with a primary employer ... over terms and conditions of employment." *Id.* at 790. That is also the case here.

Third, even if this Court were to adopt the more restrictive test of cases such as *Ashley, Drew & Northern Ry. v. United Transportation Union*, 625 F.2d 1357 (8th Cir.1980), which stated that the controversy there did not constitute a labor dispute within the meaning of the Norris-LaGuardia Act because the secondary target was not "substantially aligned" with the struck employees, and accordingly approved the issuance of an injunction, the result there reached would not follow here. The evidence in this case demonstrates that a significant exchange of freight and rail cars occurs between the CVR and the struck carriers, thus creating the "significant commonality of interest" between the primary and secondary targets required by *Ashley* to invoke Norris-LaGuardia.[7] *Accord, Brotherhood of Railroad Trainmen v. Atlantic Coast Line R.R.*, 362 F.2d 649, 651 (5th Cir.), *aff'd by an equally divided court*, 385 U.S. 20, 87 S.Ct. 226, 17 L.Ed.2d 20 (1966).

### III

▮ Considering only the Norris-LaGuardia Act, therefore, Congress' directive to the courts to refrain from interfering by injunction in an economic struggle between employer and employee clearly applies to this case.[8] The analysis cannot stop there, however. The Railway Labor Act (RLA) demands that employers and employees in a covered industry make use of statutorily-created dispute resolution mechanisms before resorting to strikes, pickets, or other self-help remedies. If that mandate of the RLA is to have any practical effect, it must be judicially enforceable notwithstanding the Norris-Laguardia Act, and the courts have so held. *See Chicago & North Western Ry. Co. v. United Transportation Union*, 402 U.S. 570, 582, 91 S.Ct. 1731, 1737, 29 L.Ed.2d 187 (1971). In other words, the RLA offers an exception to the Norris-LaGuardia mandate in some circumstances.

While that much is clear, the scope of that exception is not easily defined because legislative and appellate guidance is scant. The problem is exacerbated here because the factual situation presently before this Court appears to be unprecedented.

That having been said, the Court has available some guidelines, particularly those laid down by the Supreme Court in the *Chicago & North Western* case, *supra.* According to the decision in that case, what a trial court must do when confronted by an action which involves both Norris-LaGuardia and the RLA is to "trace out as best [it] can the uncertain line of appropriate accomodation of two statutes with purposes that lead in opposing directions." *Id.* However, the statutory mandates are not to be accorded equal weight: the provisions of the Norris-LaGuardia Act enjoy a certain advantage, for "the vagueness of the [RLA's] obligation ... [must not be permitted to] provide a cover for freewheeling judicial interference in labor relations of the sort that called forth the Norris-LaGuardia Act in the first place." *Id.* at 583, 91 S.Ct. at 1738. "These weighty considerations ... counsel restraint in the issuance of strike injunctions based on violations of [the RLA]." *Id.* Restraint is even more appropriate in a case involving picketing rather than an actual strike, if only be-

---

7. The parties stipulated that approximately 90 cars were interchanged daily between the struck carriers and CVR prior to the March strike against the Guilford system, and that approximately 20 cars have been interchanged daily since the strike began.

8. This conclusion is not impaired by the railroad's contention that the union's activity might violate the Interstate Commerce Act. *See Order of Railroad Telegraphers v. Chicago & North Western R. Co.*, 362 U.S. 330, 338–39, 80 S.Ct. 761, 765–66, 4 L.Ed.2d 774 (1960).

224

cause the threat of disruption to interstate commerce that the RLA is designed to avoid, *see* 45 U.S.C. § 152 (First), may be less where only pickets are involved.[9]

For all these reasons, plaintiff's broad assertion that "an injunction can issue where a union's threatened or actual conduct violates its obligations under the RLA" (Plaintiff's Memorandum at 20) does not constitute a correct statement of the law; the RLA exception to the Norris-LaGuardia Act is far narrower than that. The Supreme Court instructed the lower courts in *Chicago & North Western* to issue an injunction in an RLA case only "when such a remedy is the only practical, effective means of enforcing the duty to exert every reasonable effort to make and maintain agreements...." 402 U.S. at 583, 91 S.Ct. at 1738. The duty to which the Court referred in that instruction is the duty of the parties to exhaust the various steps of notice, conference, and mediation (hereinafter generally referred to collectively as mediation) set out in the RLA before resorting to self-help. *See Detroit & Toledo Shore Line R.R. v. United Transportation Union*, 396 U.S. 142, 149, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969); *Railway Clerks v. Florida E.C.R.R.*, 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501 (1966).

■ It is also clear from the cases that, in establishing these procedures, Congress did not intend to deprive the union of its self-help option—direct economic pressure to induce the employer to meet the employees' demands. *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378–79, 89 S.Ct. 1109, 1115–16, 22 L.Ed.2d 344 (1969). "[The RLA's] compulsions go only to insure that [its] procedures are exhausted before resort can be had to self-help. No authority is em-

powered to decide the dispute and no such power is intended...." *Id.* at 380, 89 S.Ct. at 1116 (*quoting Elgin, J. & E.R. Co. v. Burley*, 325 U.S. 711, 725, 65 S.Ct. 1282, 1291, 89 L.Ed. 1886 (1945)). Implicit in the statutory scheme is the possibility that a dispute may not be resolved by the RLA mediation procedures, and that a party may then seek to resolve the dispute through any method of economic pressure, including a nationwide picket of rail carriers if such pickets are otherwise lawful. *See id.* at 378, 89 S.Ct. at 1115. At that stage, an injunction could not validly issue.

■ Thus, under *Chicago & North Western Ry. Co.*, this Court may enjoin the BMWE pickets only if an injunction is "the only practical, effective means" of enforcing the RLA's mediation procedures. 402 U.S. at 583, 91 S.Ct. at 1738. The union's duty to observe these procedures in its dispute with the primary targets—the Maine and Portland companies—could not now justify an injunction, because with respect to these companies that duty has been fully discharged. Both parties cooperated with the Mediation Board; that Board attempted to reach an accommodation through mediation; but after one and one-half years of this process an impasse was reached.[10] With respect to those companies, therefore, BMWE finds itself exactly in the position contemplated by *Jacksonville Terminal*—free to utilize self-help after exhaustion of the RLA's dispute resolution remedies.

IV

■ This conclusion leads to the most difficult of the issues before the Court: once a union has fully complied with the RLA dispute resolution process with respect to the primary employer, must it also utilize that process with respect to any

**9.** Picketing may or may not lead to a complete work stoppage. See note 20, *infra.* Moreover, peaceful picketing is protected to a significant degree by the First Amendment to the Constitu-

tion. *Cafeteria Employees Union v. Angelos,* 320 U.S. 293, 64 S.Ct. 126, 88 L.Ed. 58 (1943).
**10.** The union's exhaustion of RLA remedies vis-a-vis the primary targets is not disputed by the parties.

secondary employer it pickets [11] as a means of economic pressure on the primary employer in order to be entitled to the benefit of the no-injunction mandate of the Norris-LaGuardia Act?

On that issue, the CVR asserts that its controversy with the union over secondary picketing is a dispute separate and distinct from the contract disagreement between the union and the struck Maine carriers, and that failure of the union to cooperate in mediation [12] pursuant to the RLA with respect to the "secondary dispute" constitutes a violation of the RLA. It follows, according to the railroad, that judicial refusal to issue an injunction would deprive it of "the only practical, effective means" of enforcing its independent right to request RLA mediation. That argument is certainly not without persuasive force. However, upon full consideration and reflection, the Court has concluded that it does not sufficiently take account of the considerations underlying the two statutes, and that it must be rejected.

First, while a dispute exists between CVR and the union, it is an extremely narrow one. The only dispute between these parties involves the legal question whether the pickets at plaintiff's rail yards should or should not be allowed to continue. Unlike a dispute over such practical subjects as wages or working conditions,[13] there is nothing here that can realistically be mediated.

Second, as indicated at p. 224, *supra,* secondary picketing, whether following upon the unsuccessful exhaustion of mediation or where mediation is not appropriate, is a lawful self-help remedy in the railroad industry. Indeed, the Supreme Court held in *Jacksonville Terminal, supra,* that "picketing—whether characterized as primary or secondary—must be deemed conduct protected against state proscription." 394 U.S. at 393, 89 S.Ct. at 1123. Although plaintiff has argued in various ways for a limitation of the holding of *Jacksonville Terminal,* the only logical interpretation of that decision as applied to this case is that the BMWE has the right without fear of court interference to initiate secondary pickets against CVR in aid of its dispute with the Maine and Portland companies.

Third, the Court could not order mediation of this secondary "dispute" between the railroad and the union without severely undermining the careful balance of the RLA, in which Congress sought on the one hand to discourage disruptions of interstate commerce, while preserving on the other the parties' ultimate resort to self-help. *See Jacksonville Terminal,* 394 U.S. at 379, 89 S.Ct. at 1115. If the plaintiff's argument were accepted by the Court, the union would for all practical purposes be deprived of the opportunity to exert economic pressure on the primary target through secondary activity. The District Court for the District of Maryland, in *Western Maryland R.R. Co. v. System Bd. of Adjustment,* 465 F.Supp. 963, 968 (D.Md. 1979), a case not unlike this one, agreed several years ago that secondary picketing is not a dispute capable of mediation under the RLA:

---

11. Unlike the National Labor Relations Act, 29 U.S.C. § 158, the RLA does not prohibit secondary activity but allows such activity as a legitimate form of economic pressure. *See Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 378–79, 89 S.Ct. 1109, 1115–16, 22 L.Ed.2d 344 (1969).

12. There is some doubt whether the railroad has properly invoked the mediation provisions of the Act. However, for present purposes the Court will assume that the railroad has taken the necessary procedural steps.

13. 45 U.S.C. § 152 First. It could not properly be argued that the issue of CVR's aid and comfort to the struck carriers can be mediated for, as the subsequent discussion makes clear, Congress could not have intended that a union be forced to mediate a dispute that is destined to become moot long before the statutory process runs its course. This Court will not impose a hypertechnical interpretation upon the RLA that effectively outlaws secondary picketing in RLA cases, when Congress has clearly declined to prohibit secondary picketing as an express matter.

The defendant union has exhausted all settlement procedures under the Railway Labor Act, and is presently engaged in a self-help effort against the N & W. Its "dispute" with the plaintiff carriers is no more than incident to its underlying dispute with the N & W. By their reading of the Act, plaintiffs would effectively reduce the weapons available to labor once the "resort to economic warfare" has been authorized by initial compliance with the settlement procedures of the Act. These weapons include the strike and secondary picketing aimed at shutting down the operation of a target employer by appealing to all affiliated workers to cease labor on his behalf. It is clear that once settlement procedures have been exhausted, the Act does not authorize the Court, or any other arm of government, to intervene to alter the balance of economic forces in favor of one side or the other. *See, e.g., Railway Clerks v. Florida E.C.R. Co.,* 384 U.S. 238, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966).

To put it another way, an injunction here would not *preserve* the dispute pending mediation; rather, it would *resolve* the dispute in the employer's favor by removing the pickets. The union would then be asked to participate in "mediation" of a dispute which the employer has neither the incentive nor the power to resolve.[14]

■ To be sure, the CVR would in theory face the possibility of renewed picketing once "mediation" was exhausted. However, the Court must take judicial notice of the usual length of the RLA's mediation proceedings,[15] and conclude that the picketing dispute would almost certainly be mooted by resolution of the primary strike long before those proceedings were completed. Even worse, the union would likely be required to endure this process in multiple mediation proceedings invoked by each secondary target in succession,[16] wearing the union down still further. In short, in this instance mediation is a one-way street that would protect the employer from all secondary activity and deprive the union of an acknowledged weapon in its self-help arsenal. The Court will not impose an interpretation upon the RLA that would effectively outlaw secondary picketing in railroad cases when Congress has unambiguously decided not to do so as an express matter.

The Supreme Court has previously admonished the lower courts to refrain from using the RLA so as to deprive either party of its legitimate self-help remedies. In *Railway Clerks v. Florida E.C.R.R., supra,* 384 U.S. at 246, 86 S.Ct. at 1424, the Court held that a carrier was not required to exhaust the RLA mediation processes a second time as a prerequisite to its alteration of certain working conditions in the face of a strike. Once RLA mediation had been exhausted with respect to the contract issues that generated the strike, the employer was free to abrogate other contract rights in order to meet the strike without any obligation to return once more to RLA's alternative dispute resolution mechanisms. The Court's reasoning is also directly pertinent here:

> If, therefore [the RLA] is applicable after a lawful strike has been called and after lawful self-help has been invoked by the carrier, the right of self-help might well become unilateral to the workers alone, and denied the carrier.

*Id.* at 246, 86 S.Ct. at 1424.

Fourth, the union's position is supported by the language of the statute.[17] Section

---

**14.** The CVR has no means of resolving the substantive dispute between the Maine railroads and the union.

**15.** See pp. 224–225, *supra.*

**16.** The Court was advised during the hearing of this case that there are some five hundred railroads nationwide. Sixty-six of these railroads have invoked the RLA against the BMWE.

**17.** The Court takes note that the District Court for the Northern District of Illinois addressed these same issues within the past two days and reached a contrary result. *Burlington Northern Railroad Co. v. BMWE,* No. 86 C 2442 (N.D.Ill. April 24, 1986) [Available on WESTLAW, DCTU database]. That court applied the commonality of interests test and determined that the Norris-LaGuardia Act did not bar an injunction. In *Burlington Northern,* however, unlike in the

152 First of the RLA speaks of a dispute between "the carrier and the employees *thereof*," and similarly section 152 Second speaks of disputes between "a carrier or carriers and *its* or *their* employees" (emphasis supplied). CVR has no dispute with its own employees; its dispute is with the striking employees of the Maine railroads who seek to exert pressure on *their* employers by picketing CVR.[18]

It would be a strained reading of the Act to hold that it requires mediation between a carrier and striking workers of another employer who have no relationship with the carrier other than the pickets themselves. This Court is not prepared to adopt a construction of the RLA so at odds with common sense, especially in light of the statute's careful balancing of mediation and the self-help remedies and the Supreme Court's pronouncement that the Norris-LaGuardia Act should not give way to the RLA and its procedures absent compelling circumstances.[19]

Fifth, plaintiff argues that denial of an injunction in this case will set a precedent of far-reaching consequences for future labor disputes. If secondary picketing is not a dispute cognizable under section 155 of the RLA, plaintiff reasons, a union will be able to stage nationwide pickets—or a nationwide strike—every time one of its locals exhausts RLA procedures without success.

One answer is that, as the facts in this case demonstrate, it is not that easy to mount nationwide picketing or a nationwide strike for the sake of a labor dispute that is geographically narrow. In fact, as the record here shows, the BMWE has attempted for several weeks to mount such efforts with a singular lack of success.[20]

Even if such a strike should spread, moreover, the RLA would not leave interstate commerce and the public remediless. Section 10 of the RLA, 45 U.S.C. § 160, authorizes the National Mediation Board to notify the President of the United States whenever a dispute "threaten[s] substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service." The President may then avert a work stoppage for sixty days by appointing an emergency board to investigate the dispute.

The National Mediation Board is better equipped to make determinations regarding the impact on commerce than the courts, and allowing it to do so, with the possibility of action by the President, is more appropriate than any attempt by "construction" to avoid the mandate of the Norris-LaGuardia Act against the issuance of judicial orders in labor disputes.

The proposition that a nationwide work stoppage may not be susceptible of injunctive relief is no doubt disturbing to the rail carriers. Yet is has never been the law that the Norris-LaGuardia Act may be set aside merely because a union's economic pressure causes difficulties to the efficient flow of interstate commerce. Indeed, the

case at bar, the plaintiff railroad does not share any direct physical rail connections with the struck railroads in Maine. In addition, the *Burlington Northern* court held that the BMWE's failure to mediate its dispute with the secondary railroads violated the directives of section 152 First of the RLA, which requires that all rail carriers and their employees attempt to settle disputes to avoid disrupting commerce. For the reasons discussed *supra*, this Court rejects this interpretation of that section and finds that a secondary picket is outside of the mediation requirement of the RLA.

18. Although section 155 First also more generally mentions "any other dispute," the statute clearly contemplates a dispute that can be mediated. Here, the only real dispute between CVR

and the picketers is one over the lawfulness of secondary pickets. Although it is also a labor dispute, it is not one that mediators can resolve.

19. *See also, Judicial Approaches to Secondary Boycotts Under the Railway Labor Act,* 42 N.Y.U. L.Rev. 928, 933 (1967).

20. Picketing in Los Angeles and Cleveland, for example, has apparently had no effect whatever on rail operations. That is not surprising. Unless a nationwide dispute over wages, working conditions, and the like directly affecting them is involved, employees in one part of the country are not likely to resort to extended strike activity with all of its inconveniences and financial burdens.

Norris-LaGuardia Act was enacted precisely to counteract the tendency of courts to meddle in publicly disruptive labor disputes. The proper remedy for a nationwide strike, should one occur, is to be found in Presidential action under section 10 of the Act, and in Congress' demonstrated willingness, if necessary, to intervene in such strikes on a case-by-case basis.[21]

The courts are not infrequently admonished to refrain from expanding their proper authority, particularly when such expansion would be at the expense of the powers and responsibilities of other branches of government. This case involves one statute which directs the courts not to issue injunctions in labor disputes and another which vests the power to deal with nationwide rail strikes in the President of the United States. It is thus a singularly appropriate case for restraint in the exercise of judicial authority.

For the reasons stated, plaintiff's motion for a preliminary injunction is denied.

21. *See, e.g.,* Act of Aug. 28, 1963, Pub. L. 88–108, 77 Stat. 132; *see generally* 1 Federal Legislation to End Strikes: A Documentary History, C. VI, Subcommittee on Labor of Senate Committee on Labor and Public Welfare, 90th Cong., 1st Sess. (Comm. Print 1967).