**CENTRAL VERMONT RAILWAY, INC., Appellant,**

v.

**BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES, et al., Appellees.**

No. 86–5245.

United States Court of Appeals, District of Columbia Circuit.

Argued May 2, 1986.

Decided May 14, 1986.

Opinion June 27, 1986.

Edward A. Brill, New York City, appearing pro hac vice by special leave of Court, with whom Donald Savelson, Washington, D.C., and Mary P. Sclawy, Detroit, Mich., were on brief, for appellant.

Harry A. Rissetto, with whom William J. Curtin, Thomas E. Reinert, Jr., and Robert D. Manfred, Jr., Washington, D.C., were on brief, for amici curiae, Alton & Southern Ry. Co., et al., urging reversal.

James L. Linsey, New York City, with whom Louis P. Malone, Washington, D.C., John S. Bishop, and Michael Barrett, New York City, were on brief, for appellees. Franklin K. Moss, New York City, also entered an appearance for appellees.

Before EDWARDS, STARR, and SIL-BERMAN, Circuit Judges.

PER CURIAM.

This cause came on to be heard on appeal from the United States District Court for the District of Columbia and was briefed and argued by counsel on an expedited basis. It is

ORDERED and ADJUDGED by the Court that the judgment from which this appeal is taken is affirmed. The Norris-La-Guardia Act divests the federal courts of jurisdiction to enjoin specified acts "in any case involving or growing out of any labor dispute." 29 U.S.C. § 104 (1982). The secondary picketing at issue in this case falls within the plain terms of the Act, *id.* § 104(e), and whether or not the target of this picketing is "substantially aligned" with the picketing individuals' employer is irrelevant. *Accord Smith's Management Corp. v. International Bhd. of Elec.*

*Workers,* 737 F.2d 788 (9th Cir.1984). That such picketing is alleged to violate the Interstate Commerce Act does not alter this result. *See Order of R.R. Telegraphers v. Chicago & N.W.R.R.,* 362 U.S. 330, 339 n. 15, 80 S.Ct. 761, 766 n. 15, 4 L.Ed.2d 774 (1960). Moreover, because the union activity here is not subject to the dispute resolution mechanism of the Railway Labor Act, 45 U.S.C. § 151 *et seq.* (1982), neither may an injunction issue under the authority of *Chicago & N.W. Ry. v. United Transp. Union,* 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971).

An opinion setting forth the Court's reasoning more fully will follow. It is

FURTHER ORDERED, by this Court, *sua sponte,* that the Clerk shall withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. *See* Local Rule 14, as amended on November 30, 1981 and June 15, 1982. This instruction to the Clerk is without prejudice to the right of any party at any time to move for expedited issuance of the mandate for good cause shown.

## OPINION

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

The question to be decided is whether the Norris-LaGuardia Act, 29 U.S.C. §§ 101–115 (1982), prevents a federal court from enjoining a railroad union from engaging in "secondary picketing" against a carrier. For the reasons stated herein, we conclude that it does.

The Brotherhood of Maintenance of Way Employees ("BMWE") represents certain railroad workers employed by the Maine Central Railroad Company and the Portland Terminal Company. Since March 1986, BMWE's members have been on strike against these companies and have been subject to a lock-out. In April, BMWE began picketing at the yards of other railroads. While the striking workers had no direct dispute with these rail-roads, they sought to pressure them to cease doing business with their employers. The railroads targeted by this "secondary picketing" brought suit below, claiming that BMWE's activity violated the Railway Labor Act and the Interstate Commerce Act, and sought an injunction. The district judge initially denied relief on the ground that the plaintiff railroads had not demonstrated irreparable harm. The appellant Central Vermont Railway, Inc., then filed a separate motion for preliminary injunction, claiming that *its* operations had ground to a halt as a result of the picketing. Required thus to reach the legal issues presented, the district court held that the Norris-LaGuardia Act barred injunctive relief. In light of the urgency of this controversy, we agreed to hear Central Vermont's appeal on an expedited basis.[1]

## I.

■ In the early decades of this century, the federal courts undertook the task of abating labor unrest, using various federal and state law doctrines to enjoin workers from participating in concerted activities viewed as wrongful. *See* F. Frankfurter & N. Greene, The Labor Injunction 5–17 (1930). The choices about desirable public policy that judges necessarily made in applying these legal doctrines to the world of labor relations, however, came to be widely viewed as an exercise in judicial activism. The Congress, "intent upon taking the federal courts out of the labor injunction business," *Marine Cooks & Stewards v. Panama S.S. Co.,* 362 U.S. 365, 369, 80 S.Ct. 779, 783, 4 L.Ed.2d 797 (1960), responded with the Norris-LaGuardia Act, Pub.L. No. 72–65, 47 Stat. 70 (1932) (current version at 29 U.S.C. §§ 101–115 (1982)). The Act, a singularly powerful instrument, withdrew the federal courts' jurisdiction to enjoin numerous forms of self-help "in any case involving or growing out of any labor dispute...." 29 U.S.C. § 104 (1982). Among the acts that federal courts have since been powerless to enjoin is "giving publicity to

---

**1.** Other plaintiff railroads have participated in this appeal as *amici curiae.*

... any labor dispute, whether by advertising, speaking, *patrolling*, or by any other method not involving fraud or violence." *Id.* § 104(e) (emphasis added).

Disputing the apparent applicability of this jurisdictional bar to the controversy before us, Central Vermont argues that this case does not "involv[e] or grow[ ] out of any labor dispute" under the Act. Central Vermont insists that because it is a neutral bystander, not substantially aligned with the strikers' employers, the picketing it seeks to have enjoined is not part of a "labor dispute" covered by the Act. This theory draws support from decisions of the Fifth and Eighth Circuits, which interpret the Act as reaching only those activities in furtherance of employees' economic self-interest; this self-interest, in turn, is regarded as justifying secondary picketing only where the target of the picketing is substantially aligned with the picketing individuals' employer. *See Brotherhood of R.R. Trainmen v. Atlantic Coast Line R.R.*, 362 F.2d 649 (5th Cir.), *aff'd by an equally divided Court*, 385 U.S. 20, 87 S.Ct. 226, 17 L.Ed.2d 20 (1966); [2] *Ashley, Drew & Northern Ry. v. United Transp. Union Local No. 1121*, 625 F.2d 1357 (8th Cir.1980). The Ninth Circuit, however, has recently rejected this interpretation of the Norris-LaGuardia Act.

*See Smith's Management Corp. v. Local 357, IBEW*, 737 F.2d 788 (1984).

We follow the Ninth Circuit in rejecting the proposed "economic self-interest/substantial alignment" test. The test finds no place in the Act's language and is inconsistent with its expansive terms. We note in particular that the Act's proscriptions extend beyond cases that immediately "involve" labor disputes to those that "grow out of" such disputes.[3] The statutory language simply provides no warrant for a court to exclude secondary activity from the Act's purview in accordance with its views of a union's proper "economic self-interest."

Central Vermont nonetheless contends that the Act's drafters intended to incorporate the economic self-interest test. It claims that the test is stated in Justice Brandeis' dissenting opinion in *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921), which, in turn, was influential among the Act's proponents. In *Duplex*, the Court construed the anti-injunction provisions of the Clayton Act as limited to the context of "primary," employer-employee disputes. In response, Justice Brandeis advanced the view that the statute broadly shielded "the right of industrial combatants to push their struggle to the limits of the justification of self-interest...." *Id.* at 488, 41 S.Ct. at

---

**2.** To the extent that the Supreme Court's division in *Atlantic Coast Line* raised a question about the lawfulness *per se* of secondary picketing under the Railway Labor Act, we think the question was implicitly resolved three years later in *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969). *Jacksonville Terminal* held that states may not ban secondary picketing, and its rationale suggests that Congress left such activity unregulated. *See id.* at 391–93, 89 S.Ct. at 1122–23.

**3.** The Act's definitional provisions state that
A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one

or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a "labor dispute" ... of "persons participating or interested" therein....
29 U.S.C. § 113(a) (1982). A "labor dispute," in turn, includes
any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.
*Id.* § 113(c).

184. We cannot believe, however, that the Congress that passed the Norris-LaGuardia Act—or, for that matter, Justice Brandeis [4]—intended for *courts* to evaluate what activities a union's legitimate self-interest justifies. That was precisely the state of affairs that they wished to bring to a close.[5] It seems to us that the vice of the economic self-interest test is that it puts the courts back in the business of second-guessing a union's decisions about how best to pursue its members' welfare. *See Smith's Management,* 737 F.2d at 791; *Burlington N. R.R. v. BMWE,* 793 F.2d 795, 804 (7th Cir.1986).

To be sure, it might be thought that the "substantial alignment" aspect of the test sufficiently reduces judicial discretion in delimiting the scope of the Norris-LaGuardia Act with respect to secondary activity. But this standard, apparently imported from the "ally" doctrine applied under the secondary boycott provisions of the National Labor Relations Act, is itself of suspect pedigree. We have found no evidence that the drafters of the Norris-LaGuardia Act contemplated such distinctions between permissible and impermissible secondary activity. Absent the guidance of Congress or the attention of an administrative agency with expertise in the field, moreover, judicial efforts to draw such distinctions would be untenable; as the Court has observed, "[n]o cosmic principles announce the existence of secondary conduct, condemn it as an evil, or delimit its boundaries." *Brotherhood of R.R. Trainmen v.*

*Jacksonville Terminal Co.,* 394 U.S. 369, 386, 89 S.Ct. 1109, 1119, 22 L.Ed.2d 344 (1969).

Any doubts that might linger about the breadth of the Act's withdrawal of jurisdiction, moreover, are dispelled by *Jacksonville Bulk Terminals, Inc. v. ILA,* 457 U.S. 702, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982). The Supreme Court, in holding that the Act barred injunctive relief against politically motivated work stoppages, specifically rejected the argument that a "labor dispute" exists only when a union acts in its economic self-interest. *See id.* at 713–15, 102 S.Ct. at 2680–81. Concluding that "Congress deliberately included a broad definition" of the controversies subject to the Act's provisions, *id.* at 712, 102 S.Ct. at 2680, the Court accorded the Act a literal interpretation. The appellant attempts to distinguish *ILA* by noting that the case involved a "primary" employer-employee dispute. *ILA* also recognized, however, that the Act has been construed to encompass disputes grounded in noneconomic motives "[e]ven in cases where the disputants did not stand in the relationship of employer and employee...." *Id.* at 714, 102 S.Ct. at 2681 (citing *New Negro Alliance v. Sanitary Grocery Co.,* 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012 (1938)). If secondary activity resting on political motives is within the Act's scope, as the Court suggested, then we think it follows *a fortiori* that the secondary activity at issue in this case is also covered.[6]

---

4. *See Duplex,* 254 U.S. at 488, 41 S.Ct. at 184 ("[I]t is not for judges to ... set the limits of permissible contest.... This is the function of the legislature....").

5. *See id.* at 485, 41 S.Ct. at 183 ("It was objected that, due largely to environment, the social and economic ideas of judges, which thus became translated into law, were prejudicial to a position of equality between workingman and employer....").

6. For a further demonstration that the Act encompasses disputes outside of the employer-employee context, see *Marine Cooks & Stewards v. Panama S.S. Co.,* 362 U.S. 365, 80 S.Ct. 779, 4 L.Ed.2d 797 (1960) (picketing by American seamen of ship operated by foreign crew); *Bakery*

*Sales Drivers Local Union No. 33 v. Wagshal,* 333 U.S. 437, 444, 68 S.Ct. 630, 633, 92 L.Ed. 792 (1948) (union's instigation of boycott of store by suppliers in response to store's sale of nonunion commodity) (dictum); *Milk Wagon Drivers' Union, Local No. 753 v. Lake Valley Farm Prods., Inc.,* 311 U.S. 91, 95–96, 61 S.Ct. 122, 124, 85 L.Ed. 63 (1940) (picketing by drivers' union of stores carrying product supplied by rival independent contractors). *See generally National Woodwork Mfrs. Ass'n v. NLRB,* 386 U.S. 612, 622–23, 87 S.Ct. 1250, 1256–57, 18 L.Ed.2d 357 (1967); *United States v. Hutcheson,* 312 U.S. 219, 233–34, 61 S.Ct. 463, 466–67, 85 L.Ed. 788 (1941).

**1302**

## II

■ Our conclusion that this case "involves or grows out of a labor dispute," however, does not constitute the end of the matter. The Supreme Court has recognized that the Norris-LaGuardia Act's anti-injunction provisions must be accommodated in certain instances to the mandate of other federal labor statutes. *See, e.g., Boys Market, Inc. v. Retail Clerks Union Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).[7] In this regard, federal courts retain the power to compel compliance with the dispute resolution mechanisms of the Railway Labor Act, 45 U.S.C. § 151 *et seq.* (1982) ("RLA"). *See Brotherhood of R.R. Trainmen v. Chicago River & I. R.R.*, 353 U.S. 30, 39–42, 77 S.Ct. 635, 639–41, 1 L.Ed.2d 622 (1957); *Chicago & N.W. Ry. v. United Transp. Union*, 402 U.S. 570, 581–84, 91 S.Ct. 1731, 1737–39, 29 L.Ed.2d 187 (1971). This exception to the Norris-LaGuardia Act is a narrow one, however, applicable only where injunctive relief is "the only practical, effective means" of enforcing the procedural duties imposed upon parties by the RLA. *Id.* at 583, 91 S.Ct. at 1738. The dispositive issue in this case, then, is whether BMWE was required to attempt to settle its "dispute" with Central Vermont through the statutory mediation procedures before resorting to self-help.[8]

Central Vermont's controversy with BMWE clearly is not a typical dispute contemplated by the RLA's settlement procedures. The RLA generally provides for mediation of "major" disputes, which concern proposed changes in terms and conditions of employment, *see* 45 U.S.C. § 155

(First) (1982), and for adjustment of "minor" disputes, which concern the interpretation or application of agreements, *see id.* § 153 (First) (i). The instant "dispute" is neither of these. The picketing of which Central Vermont complains is being conducted by individuals who are not its employees and with whom it has no bargaining relationship. The *amici* railroads nonetheless contend that secondary disputes such as this one are "miscellaneous" disputes subject to mediation. *See id.* § 155 (First) (mediation is available for "any other dispute [other than a 'minor' dispute] not adjusted in conference between the parties or where conferences are refused"). The language of the statute, however, seems to presuppose an existing employment or bargaining relationship between the disputants: the National Mediation Board's jurisdiction over "miscellaneous" disputes is limited to "dispute[s] between an employee or group of employees and a carrier...." *Id.* § 155 (First).[9]

Not only is it difficult to fit secondary disputes within the RLA's literal terms, it is not at all apparent what the parties could be expected to attempt to settle in mediation. The railroads suggest that meaningful bargaining could be had over the placement and duration of pickets, the scope of the carriers' dealings with the strikers' employers, and indemnity for any liability the carriers may face for breaching their legal obligations. We agree, however, with Judge Greene's observation in the proceedings below that "[i]t would be a strained reading of the Act to hold that it requires mediation between a carrier and striking

7. At the same time, the Court has confirmed that "unlawfulness under *nonlabor* legislation [does] not remove the restrictions of the Norris-LaGuardia Act upon the jurisdiction of federal courts." *Order of R.R. Telegraphers v. Chicago & N.W. Ry.*, 362 U.S. 330, 339 n. 15, 80 S.Ct. 761, 766 n. 15, 4 L.Ed.2d 774 (1960) (emphasis added; citations omitted); *see also Milk Wagon Drivers' Union, Local No. 753 v. Lake Valley Farm Prods., Inc.*, 311 U.S. 91, 103, 61 S.Ct. 122, 128, 85 L.Ed. 63 (1940). Thus, Central Vermont's contention that the picketing at issue here violates a provision of the Interstate Commerce Act, 49 U.S.C. § 11101(a) (1982), does not

supply a basis upon which a federal court may afford it the injunctive relief it seeks.

8. The appellant does not dispute that BMWE fully exhausted the RLA's dispute resolution procedures vis-a-vis its members' *primary* employers before initiating the strike.

9. Similarly, the RLA's general duty to settle disputes extends only to "carriers, their officers, agents, and *employees*," 45 U.S.C. § 152 (First) (1982) (emphasis added), and the same provision refers to "dispute[s] between the carrier and the employees thereof," *id.*

workers of another employer who have no relationship with the carrier other than the pickets themselves." *Central Vt. Ry. v. BMWE*, 639 F.Supp. 220, 227 (D.D.C.1986). Carriers would have little incentive to settle a dispute with non-employees whose only bargaining chip (the picketing) is taken away by the mediation process itself. Requiring mandatory mediation as a prerequisite to secondary picketing, then, could have the practical effect of banning conduct that Congress left unregulated. *See supra* note 2.

We must conclude that the RLA's settlement mechanisms simply do not reach beyond the context of primary disputes. *Accord ConRail v. BMWE*, 792 F.2d 303 (2d Cir.1986); *Burlington N. R.R. v. BMWE*, 793 F.2d 795, 798–99 (7th Cir.1986).[10] We appreciate that this conclusion, together with our analysis of the Norris-LaGuardia Act's scope, may leave carriers without effective recourse against secondary picketing. But that result follows not from a policy choice we make but rather from the indisputable fact that the RLA does not provide a treatment of labor relations in the transportation industry as comprehensive as the National Labor Relations Act does for the rest of American industry. It is not our task to make an imperfect statute perfect.[11] We hold that because there was no RLA duty to enforce in this case, there was nothing to which the Norris-LaGuardia Act need be "accommodated." The district court therefore correctly denied Central Vermont's request for injunctive relief.

*Affirmed.*

10. The railroad *amici* point out that BMWE represents Central Vermont's employees as well as the strikers, and suggest that a "primary" dispute exists between Central Vermont and BMWE. The union's conduct, they assert, is tantamount to a demand made on behalf of Central Vermont's employees for an agreement that Central Vermont will not assist any other carrier subject to a strike. The record does not bear out this characterization of the case. BMWE has not asked for a "struck work" clause or other modification of Central Vermont's collective bargaining agreement with its employees. Insofar as BMWE seeks to force Central Vermont to cease doing business with the sturck carriers, it does not do so directly on behalf of

Central Vermont's employees. We thus find it unnecessary in this case to explore the precise accommodation of the Norris-LaGuardia Act and the RLA that would be appropriate in the scenario the railroads hypothesize.

11. As the district court noted, however, the RLA does contain certain mechanisms to deal with harmful strikes. In situations "threaten[ing] substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service," the President may convene an emergency board to investigate the controversy. *See* 45 U.S.C. § 160 (1982).