**BURLINGTON NORTHERN RAILROAD COMPANY, et al., Plaintiffs-Appellees,**

v.

**BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES, et al., Defendants-Appellants.**

No. 86–1666.

United States Court of Appeals, Seventh Circuit.

Argued May 30, 1986.

Decided June 4, 1986.

Rehearing and Rehearing En Banc Denied July 8, 1986.

John O'B Clarke, Jr., Highsaw & Mahoney, P.C., Washington, D.C., for defendants-appellants.

Richard J. Schreiber, Sen. Asst. Vice. Pres., Ft. Worth, Tex., James S. Whitehead, Sidley & Austin, Chicago, Ill., for plaintiffs-appellees.

Before FLAUM and EASTERBROOK, Circuit Judges, and SWYGERT, Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

A dispute between a tiny railroad in New England and one of its unions threatens to disrupt rail transportation throughout the United States. Concluding that any legal system that allows this to occur would deserve Mr. Bumble's condemnation, the district court issued an injunction against the union's picketing. The railroads defend the injunction on the principal ground that Congress could not have meant railroads, alone among America's principal industries, to be exposed to secondary picketing. We conclude, however, that Congress provided just this. Employees of railroads are not covered by the National Labor Relations Act, which prohibits secondary picketing and allows the National Labor Relations Board to seek injunctions. See 29 U.S.C. §§ 152(2), 152(3), 158(b)(4), 160($l$). The Railway Labor Act, 45 U.S.C. §§ 151–63, does not prohibit secondary pressures, and this dispute therefore is governed by the Norris-LaGuardia Act, 29 U.S.C. §§ 101–15, which forbids federal courts to enjoin peaceful picketing growing out of labor disputes.

I

The Brotherhood of Maintenance of Way Employees (the Union) represents some employees of the Maine Central Railroad and the Portland Terminal Company (collectively the Maine Central). Their last collective bargaining agreement expired in 1984. This failure to agree about wages and conditions of employment is a "major dispute" in the parlance of the Railway Labor Act, and it brought into play a sequence of steps starting with a conference, see 45 U.S.C. § 152 Second, and progressing through hearings before the National Mediation Board, see 45 U.S.C. § 155 First (b). See also 45 U.S.C. §§ 156, 157, 160. By March 1986 the parties had exhausted the statutory procedures, and the members of the Union went on strike on March 3. This is a lawful strike. Late in March the Union

extended the strike to the Delaware & Hudson Railroad and the Boston & Maine Railroad, which, like the Maine Central, are subsidiaries of Guilford Transportation Industries, Inc. Guilford sought but did not get an injunction against the extension of the strike. *BMWE v. Guilford Industries, Inc.*, No. 86–0084–P (D.Me. Apr. 2, 1986).

Supervisors continued to operate at least some of the services of the four Guilford companies. Although the Guilford companies collectively operate more than 4000 miles of track, reaching from Buffalo to Portland, Maine, and from Montreal to Washington, D.C., they are small as railroads go. Much of their traffic is carried in part by some other railroad on a joint or through route. The Union therefore decided in early April to put pressure on the Guilford lines by choking off their revenue from traffic they interchange with other railroads. The Union extended its picketing to railroads in the east that interchanged significant volumes of traffic with the Guilford lines. This was quickly enjoined. *Consolidated Rail Corp. v. BMWE*, Civ. 86–0318 (W.D.N.Y. Apr. 6, 1986), vacated, 792 F.2d 303 (2d Cir.1986); *Richmond, Fredericksburg & Potomac R.R. v. BMWE*, No. 86–3544 (4th Cir. Apr. 12, 1986) (Widener, J.), vacated by panel, May 5, 1986, *cert. pending*, No. 85–1792. On April 8 the Union sent a telegram to the Association of American Railroads, threatening to picket every railroad in the country. This produced a panicked series of requests for relief that have been concentrated in Chicago and the District of Columbia. In *BMWE v. Association of American Railroads* and two consolidated cases, the district court entered a temporary restraining order on April 13 but on April 25 declined to issue a preliminary injunction, 639 F.Supp. 220 (D.D.C.1986), affirmed under the name *Central Vermont Ry. v. BMWE*, 793 F.2d 1298 (D.C.Cir.1986).

The railroads' longest-lived success has been in Chicago. The Burlington Northern filed this suit on April 9 and obtained a temporary restraining order from Judge Holderman the same day. The Missouri Pacific; Union Pacific; Atchison, Topeka & Santa Fe; Baltimore & Ohio; Baltimore & Ohio Chicago Terminal; Chesapeake & Ohio; and Seaboard System railroads filed suits in Chicago immediately, and Chief Judge McGarr, as the emergency judge, issued further TROs. All of the suits were consolidated before Judge Holderman, who held a hearing and on April 23 entered a preliminary injunction against the Union's picketing.

The dispute has led to still more proceedings under the Railway Labor Act. On May 16 President Reagan issued Executive Order No. 12557, convening an Emergency Board under 45 U.S.C. § 160. The President determined that the disputes between the Union and the Maine Central "threaten substantially to interrupt interstate commerce to a degree such as to deprive a section of the country of essential transportation services." The Emergency Board must investigate the dispute and issue its report within 30 days. In the meantime, and "for thirty days after [the] board has made its report to the President, no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose." The Union interprets this language of § 160 as requiring the Maine Central to restore the status quo before the strike and to resume bargaining; the members of the Union are back at work and represent that so long as the Maine Central restores the pre-strike conditions they will stay at work. (While the Union's members are on the job at the Maine Central, they have no desire to picket the Burlington Northern and the other plaintiffs.) The Maine Central may have a different view of § 160, and there may be further litigation concerning the Union's power to resume its strike before July 15, when the statutory period ends. The Executive Order does not make this case moot. The substantive dispute between the Union and the Maine Central continues, and unless it is settled by negotiations or resolved by legislation (a

frequent ending for railroad strikes), the parties will be at each others' throats again on July 15. It remains necessary to decide whether the district court was entitled to issue an injunction.

## II

■ The eight railroads that are plaintiffs here (collectively the Railroads) are strangers to the dispute between the Union and the Maine Central. They cannot compel the Maine Central to meet the Union's demands or require the Union to be satisfied with the Maine Central's offer. The Union's picketing of the Railroads is therefore "secondary" activity, as the Union concedes. The Union hopes that the employees of other railroads will honor its picket lines, shut down the nation's railroad system, dry up the Guilford lines' source of traffic, and put pressure on Guilford to require Maine Central to cave in to the Union's requirements. The district court assumed that it is unlawful for the Union to apply economic pressure on "neutral" railroads. It did not identify the source of the legal rule forbidding secondary picketing. The Railroads maintain that the Railway Labor Act itself is the source of the rule; we return to this claim in Part IV. The principal obstacle to relief is § 1 of the Norris-LaGuardia Act, 29 U.S.C. § 101, which states that "[n]o court of the United States ... shall have jurisdiction to issue any ... injunction in a case involving or growing out of a labor dispute, except in strict conformity with the provisions of this chapter". Section 4, 29 U.S.C. § 104, repeats the command of § 1, stating that no court has jurisdiction to enjoin anyone "interested in such [labor] dispute ... from doing, whether singly or in concert, any of the following acts: ... (e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence". The Union's pickets at the Railroads' places of work are "giving publicity to ... [a] labor dispute ... by patrolling, or by any other method not involving fraud or violence". The Norris-LaGuardia Act does not contain any other provision allowing secondary picketing to be enjoined; indeed, the elimination of injunctive restraints against secondary picketing was one of the principal aims of the Norris-LaGuardia Act. *United States v. Hutcheson,* 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941); *Bakery Drivers v. Wagshal,* 333 U.S. 437, 442, 68 S.Ct. 630, 632, 92 L.Ed. 792 (1948); cf. *NLRB v. Peter Cailler Kohler Swiss Chocolates Co.,* 130 F.2d 503 (2d Cir.1942) (L. Hand, J.). See also F. Frankfurter & N. Green, *The Labor Injunction* (1930) (describing how courts frustrated one after another legislative attempt to authorize secondary picketing). Section 7 of the Norris-LaGuardia Act, 29 U.S.C. § 107, contains some exceptions from the ban on injunctions, but the parties agree that none of these exceptions applies to this case.

It therefore appears to follow that the district court was not allowed to issue an injunction. But the district court relied on a definitional provision of the Norris-LaGuardia Act. Sections 1 and 4 apply only to action "involving or growing out of a labor dispute". "Labor dispute" is defined by § 13(c), 29 U.S.C. § 113(c), to include secondary pressure. It is any "controversy concerning terms or conditions of employment ... regardless of whether or not the disputants stand in the proximate relation of employer and employee." The dispute between the Union and the Railroads is a "labor dispute" under § 13(c) because it concerns the Union's terms and conditions of employment, even though not employment by the Railroads. See also *Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n,* 457 U.S. 702, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982). Section 13(a), 29 U.S.C. § 113(a), on which the district court relied, defines "involve or grow out of". Section 13(a) states that a "case shall be held to involve or grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; ... or when the case involves any conflicting or competing interests in a 'labor dispute' (as

defined in this section) of 'persons participating or interested' therein". The district court concluded that the Union's desire to picket the premises of the Railroads does not "grow out of" a labor dispute within the meaning of § 13(a).

The court gave two reasons. First, it held, picketing of a secondary employer's premises "grows out of" a labor dispute only when the secondary employer is so "aligned" with the primary employer that its economic activity significantly undermines the union's economic interest. Slip op. 9–18, relying on *Ashley, Drew & N. Ry. v. United Transportation Union*, 625 F.2d 1357 (8th Cir.1980). The Burlington Northern does not connect with any of the Guilford lines, and over the course of a year it carries only 1,400 cars received from or bound to a Guilford line. This is 0.043% of the Burlington's traffic. The Union Pacific last year handled 601 carloads, or only 0.019% of its total business. So it goes with Santa Fe (248 carloads, 0.011% of traffic). The district court thought these and other plaintiffs just too far removed from the fray to be depicted as allies—witting or incidental—of the Guilford lines. The Baltimore & Ohio and the Chesapeake & Ohio connect directly with Guilford lines in Buffalo and Philadelphia, although not with lines of the Maine Central. The Union contends, without contradiction, that the Chesapeake & Ohio has altered its ordinary practices in Buffalo to allow Guilford supervisors to handle the connection, sparing its employees the decision whether to cross the Union's picket line. The district court concluded, however, that although the connections of traffic may be important to the Guilford lines, they are not important to the Baltimore & Ohio or the Chesapeake & Ohio, for neither the B & O nor the C & O derives even 1% of its revenues from traffic interchanged with the Guilford lines. This is too little, the district court thought, to be a "substantial alignment" of the secondary employer with the primary, and therefore the dispute does not "grow out of" the Maine Central's dispute with the Union.

The district court's second reason why the dispute does not "grow out of" a labor dispute is that the Union is applying pressure designed to induce the Railroads to violate their obligation under the Interstate Commerce Act to provide "safe and adequate service" (49 U.S.C. § 11101(a)) without discrimination. If the Railroads knuckled under to the Union, the court believed, they would violate the Interstate Commerce Act. Finally, the district court thought that an injunction would vindicate the processes of the Railway Labor Act. The Railway Labor Act requires extended conciliation of all "major disputes". The court characterized the question whether the Union could picket the Railroads as a "major dispute" subject to conciliation under the Railway Labor Act, and it concluded that it therefore was empowered to enjoin the picketing pending exhaustion of this process.

### III

The Railroads do not defend the district court's final reason. A "major dispute" under the Railway Labor Act is a dispute "concerning rates of pay, rules, and working conditions". 45 U.S.C. § 152 First. The Railroads do not have a dispute with the Union about any of these. There is a dispute about whether the Union may picket the Railroads' places of business, but this is neither a "major" dispute nor a "minor" one (one growing out of an application of a collective bargaining agreement). The principle that a court may issue an injunction against a strike during the completion of the statutory processes for the resolution of "major disputes", see *Chicago & N.W. Ry. v. United Transportation Union*, 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971) (collecting earlier cases), therefore does not apply. There are no statutory processes to complete. An injunction would not hold the dispute in stasis pending mediation; it would resolve the dispute by depriving the Union of its right to self-help after completion of the tortuous path established by the Railway Labor Act.

The district court's second reason the Railroads defend but meekly. Their effort to identify a "violation" of the Interstate Commerce Act is unsuccessful. The Railroads would violate the Commerce Act if they refused to handle traffic from and to the Guilford lines; the statute forbids discrimination in the handling of traffic. 49 U.S.C. § 11101(a). But the Railroads have a lawful alternative: handle all traffic, unless compelled by a strike to handle none. Presumably the Railroads would urge their employees not to honor the Union's picket lines. Although the Railroads suggested at oral argument that shutting down a railroad because of a strike would violate the statutory requirement to provide safe and adequate transportation, 49 U.S.C. § 11101(a), the suggestion is ludicrous. There have been hundreds, perhaps thousands, of railroad strikes since 1887; until now no one has thought that a railroad that would like to provide service but cannot do so for reasons beyond its control is violating the statute. The Railroads offer neither legislative history nor any other support for their argument.

At all events the argument is irrelevant. The Norris-LaGuardia Act limits the authority of courts to supply a particular remedy, the injunction. No injunction should issue, with or without the Norris-LaGuardia Act, unless a strike is (or causes) a violation of some other law. One function of the Norris-LaGuardia Act, then, is to remove the injunction as a remedy for *illegal* strikes and picketing. (Another important function is to get rid of injunctions issued by judges out of hostility to organized labor or because of the mistakes that are apt to be made in the interpretations of other laws when judges must act on emergency requests in advance of full deliberation. No one contends, however, that the injunction issued here arises from anything other than a conscientious effort to apply existing legal norms.) Because a principal function of the Norris-LaGuardia Act is to limit to money damages the remedy for illegal strikes, it is unimportant that the Railroads can point to a reason why this picketing might be unlawful. The Supreme Court has held that the Norris-LaGuardia Act's ban on federal injunctions is not lifted because the conduct of the union is unlawful under some other, nonlabor statute. *Order of Railroad Telegraphers v. Chicago & N.W. Ry.*, 362 U.S. 330, 339, 80 S.Ct. 761, 766, 4 L.Ed.2d 744 (1960); *Drivers' Union v. Lake Valley Co.*, 311 U.S. 91, 103, 61 S.Ct. 122, 128, 85 L.Ed. 63 (1940). The district court conceded that its result "may be at odds with" *Telegraphers* (slip op. 19). It is.[1]

This leaves only the first of the district court's grounds, its conclusion that the Railroads are not allied with the Guilford lines and so may not be visited with secondary picketing. Before we consider this, however, we discuss an argument the district court did not reach—that the Railway Labor Act of its own force authorizes injunctions against secondary picketing. This contention, the Railroads' principal argument on appeal, was preserved in the district court, and it is therefore before us too. *Massachusetts Mutual Life Insurance Co. v. Ludwig*, 426 U.S. 479, 96 S.Ct. 2158, 48 L.Ed.2d 784 (1976).

## IV

■ The interaction between the Railway Labor Act and the Norris-LaGuardia

---

1. The Railroads rely on *Missouri Pacific R.R. v. United Transportation Union*, 782 F.2d 107, 111–12 (8th Cir.1986), which they say stands for the proposition that courts should "accommodate" the Norris-LaGuardia Act to other statutes. The Eighth Circuit sustained an injunction against a strike in reliance on 49 U.S.C. § 11341(a), which it construed as excluding railroad mergers approved by the ICC from the operation of all other laws, even the Norris-LaGuardia Act. The strike in question arose in the aftermath of a merger, and the court held that § 11341(a) allowed an injunction. We need not decide whether the Eighth Circuit correctly understood § 11341(a); the meaning of that statute is before the Supreme Court in *Brotherhood of Locomotive Engineers v. ICC*, 761 F.2d 714 (D.C.Cir. 1985), cert. granted, —— U.S. ——, 106 S.Ct. 1457, 89 L.Ed.2d 714 (1986). The Eighth Circuit concluded that § 11341(a) expressly overrode the Norris-LaGuardia Act; so too does § 10(*l*) of the NLRA, 29 U.S.C. § 160(*l*), in certain suits by the Labor Board; the Railroads do not contend, however, that any statute pertinent to this case expressly lifts the application of the Norris-LaGuardia Act.

Act is untidy. The Railway Labor Act establishes machinery for the conciliation of "major" and "minor" disputes but is silent on what happens if the ponderous mechanism fails to resolve a "major" dispute. The Norris-LaGuardia Act, enacted six years later, eliminates injunctions as remedies for peaceful picketing growing out of labor disputes but does not say whether this includes "major" disputes under the Railway Labor Act. Right from the start Members of Congress questioned the relation between these statutes. (We discuss this below.) The Supreme Court has found the going rocky, on the one hand holding that because the Railway Labor Act contemplates that the parties will refrain from self-help during the resolution of disputes, the Norris-LaGuardia Act does not apply to injunctions that support the Railway Labor Act's dispute-resolution machinery,[2] and on the other hand holding that the Railway Labor Act of its own force prevents states' issuance of injunctions after the conciliation process has run its course. *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969).

The structure of the Railway Labor Act has remained fundamentally the same despite galloping developments in other branches of labor law. The National Labor Relations Act of 1935, which applies to almost every firm affecting interstate commerce, excludes railroads and their employees. 29 U.S.C. §§ 152(2), 152(3). The NLRA initially joined the Norris-LaGuardia Act in indifference to secondary picketing, but the Taft-Hartley Amendments of 1947 added § 8(b)(4), 29 U.S.C. § 158(b)(4), which forbids most secondary picketing and secondary boycotts. The Taft-Hartley Amendments also added §§ 10(j) and 10(*l*), 29 U.S.C. §§ 160(j) and 160(*l*), which permit the Labor Board to seek injunctions against forbidden practices, including secondary activity. Since 1947, then, injunctions have been available at the Board's discretion against secondary picketing in almost every business except railroading. The Railroads therefore press the claim that Congress could not have meant the railroad industry, the subject of the earliest comprehensive labor relations legislation, to be laid waste by a practice that has been banned in every other industry. Why would Congress exclude *only* railroads?

Why railroads? is not a question open to courts, however. The NLRA excluded railroads for reasons Congress found sufficient. There are anomalies no matter how we decide. One could as easily ask why Congress would have allowed *employers* to seek injunctions against secondary picketing only in the railroad business, while interposing the Labor Board between employers and the courts for the rest of American industry.[3] The Railroads' contention that injunctions are available against secondary picketing under the Railway Labor Act implies that between 1932 and 1947 railroads were the only industry protected against this practice. Just as it is hard to see why railroads alone should be excluded from this protection today, it is hard to see why they would be the only ones protected (under the Railroads' position) in 1932. The interaction of statutes often is not smooth, differences often have no articulable rationale, and statutes enacted 21 years apart (as the Railway Labor

**2.** E.g., *Chicago & N.W. Ry. v. United Transportation Union*, 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971); *Brotherhood of Locomotive Engineers v. Louisville & Nashville R.R.*, 373 U.S. 33, 83 S.Ct. 1059, 10 L.Ed.2d 172 (1963); *Brotherhood of Railroad Trainmen v. Chicago River & Indiana R.R.*, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957).

**3.** The requirement of the Labor Board's involvement is unyielding. Only the Board may bring suit under the NLRA against secondary picketing. One possible end run would have been an injunction against employees' honoring the secondary picketing. *Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), held, however, that the Norris-LaGuardia Act forbids the issuance of such injunctions pending arbitration, even when the collective bargaining agreement contains both a clause forbidding sympathy strikes and an arbitration clause. (An injunction may be available to enforce the arbitrator's decision, however.)

Act and Taft-Hartley Amendments were) often pull in dramatically different directions. Courts must abide by the legislative choice unless the Constitution compels identical treatment (which no one contends in this case). The meaning of the Railway Labor Act depends on what happened in 1926, as the meaning of the Norris-LaGuardia Act depends on what happened in 1932. We put to one side all later developments. (The Railway Labor Act has been amended many times since 1926, but none of these amendments helps to resolve today's dispute.) That secondary picketing is unlawful and enjoinable today in almost every other industry is none of our business. The Railroads are governed by the compromises Congress made in 1926 and 1932.

The Railroads' arguments under the Railway Labor Act depend on two propositions: first, that the Railway Labor Act makes secondary picketing unlawful; second, that anything unlawful under the Railway Labor Act may be enjoined notwithstanding the Norris-LaGuardia Act. Neither is correct.

The Railway Labor Act supplies mechanisms for resolving disputes but does not say what parties may do if a "major" dispute cannot be resolved.[4] The silence of the statute leaves the parties to engage in self-help. The Railroads do not dispute the Union's right to strike the Maine Central or even all the Guilford lines, but they say that the law forbids secondary picketing. Because the statutory language does not hint at such a prohibition, the Railroads turn to the law in force in 1926. No doubt this law forbade secondary picketing. E.g., *Duplex Printing Co. v. Deering*, 254 U.S. 443, 475–77, 41 S.Ct. 172, 179–80, 65 L.Ed. 349 (1921); *Toledo, A.A. & N.M. Ry. v. Pennsylvania Co.*, 54 Fed. 730 (N.D. Ohio 1893) (Taft, J.). The Railway Labor Act was designed in part "[t]o avoid any interruption to commerce or to the operation of any carrier engaged therein", 45 U.S.C. § 151a(1). See also *Texas & New Orleans R.R. v. Brotherhood of Railway & Steamship Clerks*, 281 U.S. 548, 565, 50 S.Ct. 427, 432, 74 L.Ed. 1034 (1930); *Chicago & N.W. Ry.*, 402 U.S. at 574–78, 91 S.Ct. at 1733–36. So, the Railroads conclude, the Railway Labor Act must incorporate the pre-Act law of secondary pressure, for otherwise parties would be free to wage destructive battles as soon as the statutory negotiation periods ended, and the Act would fail to prevent interruptions of commerce.

This argument confuses the anticipated effects of the statute with the rules the statute establishes. Congress believed that the Railway Labor Act would prevent industrial strife. But this goal is not itself a rule of law. It is a result of faithful application of the statutory rules. The Act protects interstate commerce by the mechanisms Congress provided: negotiation, negotiation, and more negotiation, all under the threat of resort to self-help. To curtail the self-help at the end of this sequence is to change the incentives under which the negotiation occurs, to make negotiation less likely to succeed (or, if it succeeds, to do so on terms unions will find inferior). If the Union's economic weapons are limited, this translates to lower wages during negotiations or reduces the employer's willingness to agree at all and allows it to hold out and implement terms unilaterally at the end of the process. We cannot say that a prohibition against secondary picketing will lead to less strife; maybe it will lead to more, as railroads stand fast and unions resort to more primary strikes.

At all events, this is not a question on which Congress has called for the courts' decisions. Some statutes prescribe goals such as safety or competition and require courts to devise the rules that will achieve those goals; others prescribe rules that

---

**4.** "Minor" disputes must be submitted to arbitration if either party requests it, and the results of this are binding on both sides. The Court has inferred from the binding quality of the arbitration a prohibition against strikes during or after the resolution of a minor dispute. *Brotherhood of Railroad Trainmen v. Chicago River & Indiana R.R.*, 353 U.S. at 34, 39–42, 77 S.Ct. at 637, 639–41; *Brotherhood of Locomotive Engineers v. Louisville & Nashville R.R.*, 373 U.S. at 38–42, 83 S.Ct. at 1062–64.

will lead to more or less of the goal. When Congress writes the rule, courts may not transmute the statute into the other form by inventing new rules to pursue the goal Congress had in mind. *United States v. Medico Industries, Inc.,* 784 F.2d 840, 844 (7th Cir.1986); *Walton v. United Consumers Club, Inc.,* 786 F.2d 303, 310 (7th Cir. 1986). The Railway Labor Act is a statute establishing rules, not a statute establishing goals and calling on the judiciary to create the rules. The rule in question is that the railroad and its unions must pursue the process of conciliation through all its many forms, in good faith (see *Chicago & N.W. Ry. v. United Transportation Union*), to its conclusion. When the process is over, each side may engage in lawful self-help. What kinds of self-help are lawful (for example, may either side use violence?) depends on other statutes. The purposes laid out in § 151a are useful only in understanding the meaning of the terms that appear in the statute, as the Court used them in *Chicago & N.W. Ry.* They are not warrants for inventing prohibitions the Railway Labor Act does not contain.

The Supreme Court stilled any doubt on this score in *Brotherhood of Railroad Trainmen v. Jacksonville Terminal.* The Railway Labor Act's process ran its course, and the union began a strike. The union's tactics included secondary picketing. (The target of this picketing was affiliated with the struck employer, but the Supreme Court made nothing of this and neither do we.) The employer obtained an injunction against the secondary picketing from a state court. The Supreme Court held that the Railway Labor Act preempted any state law that forclosed this economic weapon to the union. The employer's first argument was the same as the Railroads' argument here: that the Railway Labor Act, in order to reduce the disruption of interstate commerce, silently adopted the rule against secondary pressure that existed in 1926. The Court's answer was brusque: "To refer to the 'general' labor law, as it existed around the time the [Railway Labor] Act came into being, would be ahistorical." 394 U.S. at 382, 89 S.Ct. at

1117. The Railway Labor Act and the Norris-LaGuardia Act together repudiated rather than adopted that law. *Id.* at 382–83, 89 S.Ct. at 1117–18. The Railway Labor Act "is wholly inexplicit as to the scope of allowable self-help." *Id.* at 391, 89 S.Ct. at 1122. The Court therefore declined to adopt either "general" principles of labor law or the corpus of rules that has developed under the National Labor Relations Act. *Ibid.* It held instead that states may not regulate secondary pressure during railroad strikes, and it invited Congress to legislate if it wanted a different balance, *id.* at 392, 89 S.Ct. at 1123. Congress has been silent these 17 years.

Our case follows directly from *Jacksonville Terminal.* If states, the holders of all residual powers of governance, are forbidden to curtail secondary picketing, federal courts may not do so. The Railroads insist that *Jacksonville Terminal* concerns *only* states, that it is an application of the rule that state law is preempted when conduct is "arguably protected" *or "arguably prohibited"* by federal labor law. See *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 246, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959). Preemption of the state's law in *Jacksonville Terminal* may have meant only that the Railway Labor Act "arguably" allows secondary picketing, or even that the Act "arguably prohibits" secondary picketing. If so, there is hope yet for the Railroads. But the "arguably protected—arguably prohibited" standard for preemption was drawn from the National Labor Relations Act, a statute the Court found unhelpful in *Jacksonville Terminal.* The Court did not use this standard. It instead inquired directly whether secondary picketing is a lawful method of self-help, one Congress meant to leave unregulated, and held that it is. Cf. *Golden State Transit Corp. v. City of Los Angeles,* —— U.S. ——, 106 S.Ct. 1395, 1399, 89 L.Ed.2d 616 (1986) (treating *Jacksonville Terminal* as an example of this branch of preemption analysis in labor law). After observing that "[n]o cosmic principles announce the existence of secondary conduct, condemn it as an evil, or

delimit its boundaries", 394 U.S. at 386, 89 S.Ct. at 1120, and that it is difficult to decide even under the National Labor Relations Act how much secondary activity is too much, *id.* at 386–90, 89 S.Ct. at 1120–22, the Court posed the question whether the judicial branch should try to draw lines separating the permitted from the forbidden secondary activity under the Railway Labor Act, *id.* at 391, 89 S.Ct. at 1122. It answered No. Until Congress acts, secondary activity is to remain unregulated. The dissenting Justices agreed that federal courts may not interfere with secondary conduct. 394 U.S. at 395–96, 89 S.Ct. at 1124–26 (Black, Douglas, & Stewart, JJ.). They maintained only that state courts should be allowed to regulate conduct Congress has left alone. The Court agreed unanimously in *Jacksonville Terminal,* then, that the Railway Labor Act does not forbid secondary conduct in the main, and that federal courts should not try in the name of the Railway Labor Act to separate secondary conduct into permitted and forbidden components. This conclusion dooms the Railroads' principal argument.

Even if we were to agree with this argument, however, it would not follow that a federal court may enjoin secondary conduct (as opposed to awarding damages against the Union). There is still the Norris-LaGuardia Act, which forbids the use of injunctions in primary and secondary disputes alike. Once the mediation provided by the Railway Labor Act is over, the Norris-LaGuardia Act prevents the use of injunctions against economic self-help. *Brotherhood of Railroad Trainmen v. Chicago River & Indiana R.R.,* 353 U.S. at 42 n. 24, 77 S.Ct. at 641 n. 24, citing *Brotherhood of Railroad Trainmen v. Toledo, Peoria & W. R.R.,* 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534 (1944).[5] The Norris-LaGuardia Act does not contain an exception

for activity that is illegal under some other statute; as we have emphasized, one function of the Norris-LaGuardia Act is to disable courts from granting injunctions *despite* the illegality of the conduct. (What else would be the basis of the injunction?)

The floor debates on the Norris-LaGuardia Act contain some exchanges on which the Railroads rely. One colloquy captures the flavor of this material.

Mr. LANKFORD of Virginia.... Does this make it possible for lack of an injunction to tie up railroads and prevent them from transporting milk, for instance?

Mr. LAGUARDIA: I think the gentlemen was a Member of the House in 1926?

Mr. LANKFORD of Virginia. No.

Mr. LAGUARDIA. We then passed the railroad labor act, and that takes care of the whole labor situation pertaining to the railroads. They could not possibly come under this for the reason that we provided the machinery there for settling labor disputes.

. . . .

Mr. LANKFORD of Virginia. It does not apply to the transportation of milk or other necessities that go in interstate commerce?

Mr. LAGUARDIA. Interstate traffic is entirely covered in the railroad labor act of 1926.

75 Cong.Rec. 5499 (1932). The Railroads conclude from this and similar exchanges that the Norris-LaGuardia Act does not apply to the railroad business. The Supreme Court held the contrary in the *Toledo* case, and we are not at liberty to disregard its decision. More, the Railroads' excerpts do not tell the whole story. Right after Rep. LaGuardia said that the Norris-

---

**5.** *Toledo* actually construed § 8 of the Norris-LaGuardia Act, 29 U.S.C. § 108, which forbids the use of injunctions whenever a person has refused to exhaust other remedies, including arbitration. The Toledo R.R. refused to take a "major dispute" to arbitration. The union then resorted to violence during the strike, and violence ordinarily justifies an injunction under an exception to the Norris-LaGuardia Act, 29 U.S.C. § 107(a). The Court applied § 8 to override the permission granted by § 7(a). The implication is that when a "major dispute" in the railroad industry ends at the mediation stage, the Norris-LaGuardia Act forbids injunctions without regard to the conduct of the participants during the strike.

LaGuardia Act does not apply to railroads, Rep. Beck contradicted him, stating that railroad unions were the "chief proponents" of the bill because they would be its beneficiaries. *Ibid.* Rep. LaGuardia shortly contradicted himself, stating that the Railway Labor Act provides a mechanism to avert strikes but that the Norris-LaGuardia Act would apply in full force once a strike began. 75 Cong.Rec. 5504 (1932).

The Supreme Court has drawn the line in the place Rep. LaGuardia (finally) suggested it belongs. While the Railway Labor Act's processes continue, no one may use economic self-help. Those who violate this rule may be enjoined. See note 2 above. Once these processes are over, and a strike lawfully has begun, the Norris-LaGuardia Act forbids resort to injunctions. The Railroads concede that the Union has exhausted the procedures of the Railway Labor Act and that its strike against the Maine Central is lawful. The Norris-LaGuardia Act therefore applies to the Union's choice of tactics.

### V

■ At last we arrive at the district court's principal reason for issuing an injunction, its conclusion that the Union's secondary picketing does not "grow out of" a labor dispute within the meaning of § 13(a) of the Norris-LaGuardia Act. The district court followed *Ashley, Drew & N. Ry. v. United Transportation Union,* 625 F.2d at 1363–67, which held that action "grows out of" a labor dispute only if the primary and secondary employers are "substantially aligned". See also *Brotherhood of Railroad Trainmen v. Atlantic Coast Line R.R.,* 362 F.2d 649, 654–55 (5th Cir.), *aff'd by an equally divided Court,* 385 U.S. 20, 87 S.Ct. 226, 17 L.Ed.2d 20 (1966). "Substantial alignment" apparently means that one employer performs work in lieu of the other or affords financial assistance. The Eighth Circuit held in *Ashley, Drew* that a railroad that used the switching fa-

cilities of a struck carrier was not "substantially aligned" with the struck carrier and could not be picketed. Unless the picketing would substantially "further[ ] the union's economic interest in a labor dispute" (625 F.2d at 1363) by removing a significant source of aid to the primary employer, the court held, it may be enjoined. The Ninth Circuit has rejected the "substantial alignment" test. *Smith's Management Corp. v. Electrical Workers,* 737 F.2d 788, 790–91 (9th Cir.1984). See also *Central Vermont Ry. v. BMWE,* 789 F.2d 955 (D.C.Cir.1986) (memorandum citing *Smith's Management* with approval but noting that a fuller opinion would follow). We agree with *Smith's Management.*[6]

Section 13(a) of the Norris-LaGuardia Act states: "A case shall be held to involve or grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; ... or when the case involves any conflicting or competing interests in a 'labor dispute' (as defined in this section) of 'persons participating or interested therein' (as defined in this section)." 29 U.S.C. § 113(a). The Union's secondary picketing "grows out of" a labor dispute under § 13(a) in several ways. The Union's members want to picket other firms "engaged in the same industry" as the Maine Central. They seek support from employees of the "same trade, craft, or occupation". The Railroads have "indirect interests" in the business of the Maine Central because they interchange traffic with the Maine Central directly (the B & O and C & O) or indirectly (the other plaintiffs). The Union seeks to appeal to other people "who are members of the same or an affiliated organization of ... of employees". And the dispute involves "conflicting or competing interests in a 'labor dispute'

---

**6.** The Railroads distinguish *Smith's Management* on the ground that it does not involve the railroad industry. It should be obvious from the discussion in Part IV that this is not a pertinent difference.

... of 'persons participating or interested therein'", because those terms are defined broadly enough to cover the Union's disputes with both Maine Central and the Railroads. See *Jacksonville Bulk Terminals,* 457 U.S. at 709–20, 102 S.Ct. at 2678–84. In order to hold that the Union's picketing does not "grow out of" a labor dispute, we would have to overcome a lot of strong statutory language.

The Eighth Circuit felt up to this task because, it thought, a literal reading of § 13(a) would be "absurd" (625 F.2d at 1365). It wrote: "Consider, for example, a diversity case in which plaintiff seeks specific performance of a contract to sell real property. If both plaintiff and defendant belong to the same industry, trade, craft, or occupation, or have direct or indirect interests therein, a literal construction of section 13(a) would operate to deprive the federal courts of injunctive jurisdiction. The obvious lesson is that one cannot make sense of section 13(a) simply by focusing on the character of the parties; one must also consider the subject matter of the dispute." 625 F.2d at 1365 (footnote omitted). Granted one must focus on the subject matter of the dispute; the Norris-LaGuardia Act applies only to *labor* disputes, a defined term. The need for the conjunction of a "labor dispute" with something that "grows out of" that dispute does not argue for a creatively narrow construction of "grows out of", as the Eighth Circuit thought. To the contrary, the restriction of the Norris-LaGuardia Act to "labor disputes" means that courts may apply § 13(a) according to its language without engendering absurd consequences.

The Norris-LaGuardia Act was designed to overthrow the regime of *Duplex Printing; Bedford Cut Stone Co. v. Stone Cutters,* 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916 (1927); *Lawlor v. Loewe,* 235 U.S. 522, 35 S.Ct. 170, 59 L.Ed. 341 (1914) (*Danbury Hatters*); and like cases, and to protect secondary conduct. See § 4(e), 29 U.S.C. § 104(e). It stays the hands of courts whose creativity had been employed in the service of management. The Norris-La-Guardia Act was a reaction to creatively narrow constructions of former § 20 of the Clayton Act, which had been meant to get the courts out of the business of issuing labor injunctions, but which courts had tortured until it was inapplicable to secondary conduct. See Frankfurter & Green, *The Labor Injunction. Ashley, Drew* is a step down a path that the Norris-LaGuardia Act has condemned.

No union engages in secondary conduct without expecting to advance its economic interests. Picketing takes time and money, and a call on other workers to strike is a demand for the sacrifice of fellow union members. Unions do not lightly call in their chips and impose burdens on other workers who find their own pay and working conditions satisfactory. Just as a union will not engage in secondary picketing without having something to gain, so it will never find an employer with as much at stake as the primary employer. How closely related is the secondary employer to the primary employer? This is not a matter of precise calculation, of all or nothing. There are shades, probabilities, nuances. It also depends on one's perspective. The Nation's railroads collectively exchange a small percentage of their traffic with the Guilford lines; but the Guilford lines interchange a large percentage of their traffic with the Nation's other carriers. Under the "substantial alignment" test of *Ashley, Drew* the court must assess the wisdom of the union's call on the help of employees of the secondary employer. Will a strike at the secondary employer put "a lot" of pressure on the primary employer? If so, the union may make the call; if not, not. A court applying the "substantial alignment" test is weighing the economic gains to the union's members from secondary pressure against the losses the secondary conduct imposes on others in society. It is only a small exaggeration to say that this is exactly what courts were doing before 1932, exactly why Congress passed the Norris-LaGuardia Act. The union, its members, and the workers on whom the union calls for help—not the courts—must decide how "substantial" an "alignment" ought to be

to make secondary pressure appropriate. See *United States v. Hutcheson*, 312 U.S. at 236–37, 61 S.Ct. at 468–69.

## VI

The district court issued a preliminary rather than a permanent injunction. The appellate court's task in reviewing the issuance of a preliminary injunction ordinarily is to determine whether the district court abused its discretion. *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433–34 (7th Cir.1986). But a court without jurisdiction has no discretion, and there is no point in assessing the balancing of the equities when no equitable considerations could support the issuance of an injunction. We have held that the Norris-LaGuardia Act deprives the district court of jurisdiction to issue an injunction against the Union's secondary picketing. There is accordingly no reason to consider any other issue and no reason to remand for further hearings.

The judgment is reversed, and the case is remanded with instructions to dismiss the complaints for want of jurisdiction.