RICHMOND, FREDERICKSBURG AND
POTOMAC RAILROAD COMPANY,
Appellant,

v.

BROTHERHOOD OF MAINTENANCE
OF WAY EMPLOYEES, Appellee.

No. 86–3544.

United States Court of Appeals,
Fourth Circuit.

Argued May 5, 1986.

Decided July 11, 1986.

---

Fred Calvin Alexander (Thomas F. Farrell, II, Alexandria, Va., Clifford R. Oviatt, Jr., Washington, D.C., Boothe, Prichard & Dudley, Alexandria, Va., Urchie B. Ellis, Vice-President of Law, Richmond, Va., Richmond, Fredericksburg and Potomac R. Co., on brief), for appellant.

John O'Brien Clarke, Jr. (Highsaw & Mahoney, P.C., Louis P. Malone, III, General Counsel, Broth. of Maintenance of Way Employees, Washington, D.C., on brief), for appellee.

Before WIDENER, HALL and MURNAGHAN, Circuit Judges.

K.K. HALL, Circuit Judge:

Richmond, Fredericksburg and Potomac Railroad Company ("RF & P") appeals from orders of the district court denying its motions for preliminary injunctions in this action brought against the Brotherhood of Maintenance of Way Employees (the "BMWE"). In April, 1986, RF & P filed suit against the BMWE pursuant to the Railway Labor Act (the "RLA"), seeking to enjoin the union's picketing of its facilities at Alexandria and Richmond, Virginia. The picketing occurred during the pendency of a labor dispute between the BMWE and two New England railroads regarding pay and working conditions. Following RF & P's motions for preliminary injunctions to prohibit further picketing of its Alexandria and Richmond facilities, the district court concluded that it lacked jurisdiction to award the requested relief. We affirm.

## I.

RF & P is a major railway carrier connecting the northeastern and southeastern parts of the United States. It operates two railroad yards, the Potomac Yard in Alexandria and the Acca Yard in Richmond, both of which have recently been picketed by the BMWE.

The BMWE has been involved in a labor dispute with the Maine Central Railroad Company ("MEC") and its subsidiary, the Portland Terminal Company ("PT"). The MEC and PT, together with the Delaware & Hudson Railway ("D & H") and the Boston & Maine Corporation ("B & M"), are part of the Guilford Rail System, of which Guilford Transportation Industries, Inc., is the parent corporation. After exhausting the statutory procedures of the RLA without success in resolving the dispute, the union went on strike against MEC on March 3, 1986. Later that month the BMWE extended its picketing activities to the B & M and the D & H.

On April 2, 1986, MEC and PT broke off negotiations with the BMWE. The National Mediation Board, operating under the authority of the RLA, 45 U.S.C. § 151, then recessed its public interest mediation efforts without setting a future date for negotiations. The union asserts that it decided to extend its picketing further to include RF & P's Alexandria facilities in order to put economic pressure on the Guilford Rail System to bring MEC and PT back to the bargaining table.[1]

On April 4, 1986, the BMWE posted pickets at Potomac Yard. Employees of RF & P and four tenant railroads refused to cross the union's picket lines. RF & P

---

1. According to the affidavit of William E. LaRue, international vice-president of the BMWE, filed with the district court:

> The D & H operates into plaintiff Richmond, Fredericksburg & Potomac Railroad's (RF & P) yard in Alexandria, Virginia (*i.e.,* the Potomac Yard), and obtains substantial traffic by interchange with other railroads in that yard. The BMWE has determined that it is important to the effectiveness of its strike against MEC/PT to ask D & H employees and other rail employees in the RF & P's Potomac

> Yard to withdraw their services from their employers in order to prevent the movement of rail cars to or from the Guilford Rail System. This action is necessary to place sufficient economic pressure upon the Guilford Rail System to convince them that it is in their economic interests to have the MEC/PT resume negotiations with the BMWE in order to resolve the disputes with this labor organization over rates of pay, rules and working conditions for employees which the BMWE represents on the MEC and PT.

immediately sought to enjoin the picketing, alleging that such activity had a serious impact on its ability to perform services for the railroads, including those which were not involved in the MEC/PT dispute. On the same day that RF & P's action was filed, the district court denied appellant's request for a temporary restraining order ("TRO") and a preliminary injunction. The district court concluded that although RF & P appeared to be a neutral, "it's not completely disinterested in the underlying labor dispute in that it has an association and does some business with the [MEC] and [PT], which do have the underlying labor dispute and which are of the same industry." Under these circumstances, the district court found that the Norris La-Guardia Act, 29 U.S.C. § 104, deprived the court of jurisdiction to award injunctive relief.

On April 9, 1986, the union commenced picketing activity at RF & P's facilities in Richmond. The following day, RF & P returned to district court, seeking a TRO and preliminary injunction to enjoin the new picketing. Again, the district court denied relief on jurisdictional grounds.[2]

This appeal followed.[3]

## II.

On appeal, RF & P contends that, contrary to the district court's conclusion, a federal court has jurisdiction to enjoin the picketing of a neutral railroad employer in order to accommodate the mandates of both the Railway Labor Act and the Interstate Commerce Act. Appellant further argues that injunctive relief is permissible where the neutral railroad is not substantially aligned with the railroad involved in the primary dispute with the union. We disagree with each of RF & P's contentions.

At the outset, we note that the union exhausted the procedures of the RLA and thereafter engaged in a lawful strike against the MEC/PT. Moreover, the union's secondary picketing against the RF & P has been peaceful. Absent clear congressional intent to the contrary, peaceful boycotts and nonviolent picketing are a form of speech or conduct ordinarily entitled to protection under the first and fourteenth amendments to the Constitution. *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982); *American Federation of Labor v. Swing*, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855 (1941); *Thornhill v. State of Alabama*, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). Significantly, the Supreme Court has held that in railroad disputes subject to the RLA until Congress acts, peaceful picketing in both primary and secondary situations is conduct which may not be proscribed by a state. *Broth-*

---

2. In both instances the district court also denied injunctive relief pending appeal. RF & P then moved this Court for a stay of the district court's orders, pursuant to Fed.R.App.P. 8(a). On April 12, 1986, Judge Widener, as a single judge, granted an injunction in favor of RF & P pending appeal and expedited the appeal for consideration by this panel. *Brotherhood of Maintenance of Way Employees v. Richmond, Fredericksburg and Potomac R.R. Co.*, No. 86–3544 (4th Cir. April 12, 1986), *cert. denied,* —— U.S. ——, 106 S.Ct. 3285, 91 L.Ed.2d 573 (1986). After hearing argument, the panel on May 5, 1986, entered an order dissolving the injunction pending appeal (Judge Widener dissenting).

3. After we heard argument in this case, President Reagan, acting pursuant to 45 U.S.C. § 160, issued an executive order on May 16, 1986, which convened an emergency board to investigate the dispute between the union and MEC/PT and issue a report within thirty days. 45 U.S.C. § 160 provides that in the meantime and "for thirty days after [the] board has made its report to the President, no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose."

We find that the executive order does not make this case moot in light of the fact that the substantive dispute between the union and MEC/PT continues, and unless settled by negotiations or resolved by legislation, will be reactivated thirty days following the report to the President. *Burlington Northern Railroad Company v. Brotherhood of Maintenance of Way Employees*, 793 F.2d 795, 797–98 (7th Cir.1986).

erhood of *Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969). The question which we must resolve in this appeal is whether a federal court may enjoin such activity.

Section 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104, provides in pertinent part that:

> No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:
>
> (a) Ceasing or refusing to perform any work or to remain in any relation of employment; ...
>
> (e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;
>
> (f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;
>
> (g) Advising or notifying any person of an intention to do any of the acts heretofore specified;
>
> (h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and
>
> (i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified.

The plain language of this statute severely limits the power of a federal court to enter the labor dispute area. A case is deemed to involve or grow out of a labor dispute:

> when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; or (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a "labor dispute" (as defined in this section) of "persons participating or interested" therein (as defined in this section).

29 U.S.C. § 113(a). The Act defines "labor dispute" broadly:

> The term "labor dispute" includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

29 U.S.C. § 113(c). And finally,

> A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation.

29 U.S.C. § 113(b).

■ Despite the sweeping language of the Norris-LaGuardia Act, RF & P maintains that the statute cannot be viewed in isolation. According to appellant, the district court had jurisdiction to issue an injunction prohibiting the picketing at issue

here in order to accommodate the Railway Labor Act and the Interstate Commerce Act and to protect the public interest in avoiding interruption of commerce. The railroad's argument, however, would have us ignore the Supreme Court's decision in *Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Assoc.*, 457 U.S. 702, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982).

In *Jacksonville Bulk*, the longshoremen's union, reacting to the Soviet Union's intervention in Afghanistan, refused to load certain goods on ships bound for the Soviet Union. The employer then brought suit pursuant to the Labor Management Relations Act, 29 U.S.C. § 185(a), alleging that the union's work stoppage violated the terms of the collective-bargaining agreement which contained a no-strike clause and a provision requiring arbitration of disputes. The Supreme Court held that (1) the broad anti-injunction provisions of the Norris-LaGuardia Act apply even to politically motivated work stoppages, and (2) the work stoppage in question was not an arbitrable dispute which could be enjoined under the collective bargaining agreement. Addressing the issue of what constitutes a labor dispute, the Supreme Court found that the Norris-LaGuardia Act does not require that "each" dispute relevant to the case be a labor dispute, but merely requires that the case involve "any" labor dispute. 457 U.S. at 711, 102 S.Ct. at 2679. Moreover, according to the Supreme Court, the plain terms of the Norris-LaGuardia Act deprived the federal courts of the power to enjoin the union's work stoppage, precipitated by the Soviet invasion of Afghanistan, without regard to whether the union also had a nonlabor dispute with another entity. *Id.* Finally, the Supreme Court reiterated the long-standing principle that the Norris-LaGuardia Act's broad prohibition against injunctions in any labor dispute will not be constricted "except in narrowly defined situations where necessary to accommodate the Act to specific federal legislation or paramount congres-

sional policy." *Id.* at 708, 102 S.Ct. at 2678. *See also, id.* at 720, 102 S.Ct. at 2684.

We perceive no specific legislation or paramount congressional policy, either in the RLA or in the Interstate Commerce Act, which would support an "accommodation" exception to the anti-injunction mandate of Norris-LaGuardia, under the facts presented by this case. Appellant cannot simply rely on the general purposes of these statutes, i.e. to provide uninterrupted rail service and safe and adequate transportation, in order to supply the specific congressional policy necessary to override Norris-LaGuardia's prohibition of injunctive relief.

In *Burlington Northern Railroad Company v. Brotherhood of Maintenance of Way Employees*, 793 F.2d 795 (7th Cir. 1986), the Seventh Circuit addressed a similar claim by Burlington Northern which sought to challenge the BMWE's secondary picketing of the railroad's Chicago facilities in connection with the same dispute at issue here involving the Guilford System railways. In concluding that the Norris-LaGuardia Act prohibited the issuance of injunctive relief, the Seventh Circuit rejected the railroad's claim under the Interstate Commerce Act:

> The Supreme Court has held that the Norris-LaGuardia Act's ban on federal injunctions is not lifted because the conduct of the union is unlawful under some other, non-labor statute. *Order of Railroad Telegraphers v. Chicago & N.W. Ry.*, 362 U.S. 330, 339 [80 S.Ct. 761, 766, 4 L.Ed.2d 774] (1969); *Drivers' Union v. Lake Valley Co.*, 311 U.S. 91, 103 [61 S.Ct. 122, 128, 85 L.Ed. 63] (1940).

*Id.* at 800. *Accord, Central Vermont Railway, Inc. v. BMWE*, 793 F.2d 1298 (D.C.Cir.1986).

Moreover, as the Seventh Circuit in *Burlington Northern* found, there is no basis for holding that the RLA of its own force authorizes injunctions against secondary

picketing.[4] As long as the statutory procedures of the RLA have been exhausted and the primary strike is lawful, the Norris-LaGuardia Act applies to prevent a federal court from enjoining the union's resort to secondary picketing. *Burlington Northern, supra*, at 800–05.[5]

### III.

RF & P next argues that injunctive relief is permissible under the Norris-LaGuardia Act where there is no showing that the picketed neutral railroad has aided, supported or aligned itself with the railroad involved in the primary dispute with the union. Both the Fifth and the Eighth Circuits have adopted a "substantial alignment" exception to Norris-LaGuardia. *Ashley, Drew and Northern Railways v. United Transportation Union*, 625 F.2d 1357 (8th Cir.1980); *Brotherhood of Railway Trainmen v. Atlantic Coastline Co.*, 362 F.2d 649 (5th Cir.1966). *See also, Western Maryland R.R. Co. v. System Board*, 465 F.Supp. 963 (D.Md.1979). Several other circuits, however, have rejected the exception, including some which have recently done so in the context of related secondary picketing activity by the BMWE against other railroads neutral in the dispute with the MEC/PT. *Burlington Northern Railroad Co. v. BMWE*, 793

F.2d 795 (7th Cir.1986); *Central Vermont Railway, Inc. v. BMWE*, 793 F.2d 1298 (D.C.Cir.1986). *See also Smith's Management Corp. v. Electrical Workers*, 737 F.2d 788 (9th Cir.1984). RF & P urges that this Circuit adopt a "substantial alignment" exception and apply it here to permit injunctive relief. Given the expansive definition of a "labor dispute" under the Norris-LaGuardia Act and the Supreme Court's admonition to construe this term broadly, see *infra*, Part II, we see no basis for such an exception and decline to adopt it for the reasons cogently stated by the Seventh Circuit:

> Under the "substantial alignment" test of *Ashley, Drew* the court must assess the wisdom of the union's call on the help of employees of the secondary employer ... A court applying the "substantial alignment" test is weighing the economic gains to the union's members from secondary pressure against the losses the secondary conduct imposes on others in society. It is only a small exaggeration to say that this is exactly what courts were doing before 1932, exactly why Congress passed the Norris-LaGuardia Act. The union, its members, and the workers on whom the union calls for help—not the court—must decide how "substantial" an "alignment" ought to be to make secondary pressure appropriate.

**4.** There is nothing in the RLA comparable to Section 8(b)(4) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4), which prohibits certain forms of secondary picketing by non-rail labor. *See Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 376 n. 10, 89 S.Ct. 1109, 1114 n. 10, 22 L.Ed.2d 344 (1969).

**5.** We do not read *Brotherhood of Railroad Trainmen v. Chicago River and Indiana Railroad Co.*, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957), or *Piedmont Aviation v. Airline Pilots Association*, 416 F.2d 633 (4th Cir.1969), cert. denied, 397 U.S. 926, 90 S.Ct. 924, 25 L.Ed.2d 105 (1970), relied upon by RF & P, to dictate a different conclusion. In *Chicago River*, the Supreme Court sanctioned an injunction against a strike over a minor dispute that was pending under the RLA before the National Railroad Adjustment Board. Similarly, in *Piedmont Aviation*, this Court found that the parties had an obligation to bargain under the provisions of the RLA before going on strike. *Cf. Boys Mar-*

*kets, Inc. v. Retail Clerks' Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970) (Norris-LaGuardia Act did not prohibit injunction where it was undisputed that grievance in question was subject to adjustment and arbitration under collective-bargaining agreement and that employer was ready to proceed with arbitration at time injunction was sought and obtained).

In the instant case, however, RLA procedures have been exhausted and, in contrast to *Boys Market, Chicago River*, and *Piedmont Aviation*, there is no duty to arbitrate which could be the basis of a federal court injunction. *Cf. Buffalo Forge Co. v. United Steelworkers of America, AFL–CIO*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976) (*Boys Markets* exception did not apply when only the question whether a sympathy strike violated the no-strike pledge, and not the dispute that precipitated the strike, was arbitrable under the parties' collective bargaining agreement).

*Burlington Northern Railroad Co. v. BMWE, supra* at 806–07.

### IV.

For the foregoing reasons, the orders of the district court denying preliminary injunctive relief are affirmed.

AFFIRMED.

WIDENER, Circuit Judge, dissenting:

I respectfully dissent.

At the outset, I should call attention to the fact that the setting in which the majority places this case is copied from the remarks of the district judge during argument and an affidavit filed in the district court, both of which are to the effect that although RF & P appeared to be a neutral it was not completely disinterested in the underlying labor dispute in that it has an association and does some business with Maine Central and Portland Terminal, which of course are in the same industry.

The problem with this fact finding on which the majority bases its opinion is that it leaves the impression that this case is a sort of substantial alignment case, though not expressed in words.

The majority does not take into account, however, and ignores two separate fact findings of the district court made in its orders of April 4, 1986 (concerning the Potomac yard) and April 10, 1986 (concerning RF & P's Richmond facility). The April 4th order finds that RF & P is "a neutral," and the April 10th order also finds that RF & P is "a neutral," and "there is no showing that any such picketing will result in any economic impact on the ... [union]." This fact finding in an order of the court must be accepted rather than the remarks of the judge and the affidavit filed in the district court. We have addressed this subject on two occasions and held in each that a court speaks through its judgments and

orders. If the order of the court is contrary to an observation made by the judge in the transcript, and of course that would apply to the affidavit in this case also, it is the order which controls. *Murdaugh Volkswagen v. First Nat. Bank of S.C.*, 741 F.2d 41 (4th Cir.1984); *Segars v. Atlantic Coastline RR Co.*, 286 F.2d 767 (4th Cir.1961).

Far from arguing, as does the majority, that there may be some kind of tangential substantial alignment, the union embraces the district court's fact finding and takes the position that it may picket any railroad in the United States whether or not the picketed railway has any connection with the union or with the strike in Maine or with the parties to the strike in Maine. In other words, the union insists on its right to picket a neutral, as RF & P has been found to be.

I believe that the substantial alignment test of *Ashley, Drew*[1] should be applied in this case to give a federal court jurisdiction to enjoin BMWE's picketing of the RF & P's railroad yards. I also disagree with the majority's conclusion that *Jacksonville Bulk Terminals* requires that we ignore the public interest of avoiding interruption of commerce. Under the majority's interpretation of the Norris-LaGuardia Act, 29 U.S.C. § 104, et seq., BMWE can engage in picketing of any railroad facility in the country regardless of its complete disassociation from the underlying strike in Maine. I believe that such an overly broad construction of the Norris-LaGuardia Act fails to properly accommodate with the Norris-LaGuardia Act the purposes of the Railway Labor Act, 45 U.S.C. 151, et seq., and the Interstate Commerce Act, Title 49 U.S.C., esp. Ch. 111.

I disagree with the majority's broad reading of *Jacksonville Bulk Terminals*.[2]

---

1. *Ashley, Drew & Northern Ry. v. United Transportation Union,* 625 F.2d 1357 (8th Cir.1980).

2. *Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Assoc.,* 457 U.S. 702, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982).

In that case, the Supreme Court was asked to decide the power of a federal court to enjoin a labor dispute based upon a politically motivated work stoppage. The fact there was that the union refused to provide labor to the employer to handle cargo bound to, or coming from, the Soviet Union, or carried on Russian ships. The cause of the union's action was the Soviet intervention in Afghanistan. The Court held that a federal court did not have jurisdiction under the Norris-LaGuardia Act to enjoin the work stoppage because the underlying dispute was not arbitrable under the terms of the collective bargaining agreement. The Court was concerned only with the reach of those anti-injunction provisions as they related to what was obviously and in fact a labor dispute but which was based on political motives. The Court was not called upon to rule on Norris-LaGuardia's applicability absent a labor dispute. Nor was it called upon to consider any accommodation between Norris-LaGuardia and the Railway Labor Act. See *Trainmen v. Chicago R & I R Co.*, 353 U.S. 30, 40, 77 S.Ct. 635, 640, 1 L.Ed.2d 622 (1957). *Jacksonville Bulk Terminal* did, however, recognize that exceptions to Norris-LaGuardia can exist "where necessary to accommodate [that] Act to specific federal legislation or paramount congressional policy." Id. 457 U.S. at 708, 102 S.Ct. at 2678. "There must be an accommodation of ... [the Norris-LaGuardia Act] and the Railway Labor Act so that the obvious purpose in the enactment of each is preserved." *Trainmen* 353 U.S. at 40, 77 S.Ct. at 640.

Such congressional policy is found in the Interstate Commerce Act and the Railway Labor Act itself as expressed policy against interference with the flow of interstate commerce.

I believe that *Railroad Trainmen v. Terminal Co.*, 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969), is more nearly on point to the issues at hand than is *Jacksonville Bulk Terminals* because *Railroad Trainmen* dealt directly with the Railway Labor Act and its relation to the Norris-LaGuardia Act which, as I have noted, *Jacksonville Bulk Terminals* did not. In *Railroad Trainmen*, the Court concluded that state law was preempted and that the Railway Labor Act permitted unions to employ a range of peacefully economic power, "so long as its use conflicts with no other obligation imposed by federal law." Id. at 392, 89 S.Ct. at 1123. That federal law is the prohibition against interference with interstate commerce. I disagree with the majority's conclusion that such a broad congressional policy is not enough to support accommodation between the Railway Labor Act, the Interstate Commerce Act and the Norris-LaGuardia Act. At 1165. By rejecting the basic principles governing the free flow of commerce, the majority allows the BMWE to bring the nation's entire rail system to a halt because of a labor dispute it has with a small railroad in New England.

I believe that the Eighth Circuit's approach in *Ashley, Drew* is a far more reasonable method in striking harmony in this area of the law. Also in accord is *Brotherhood of Railroad Trainmen v. Atlantic Coastline Co.*, 362 F.2d 649 (5th Cir.), affirmed by an equally divided court, 385 U.S. 20, 87 S.Ct. 226, 17 L.Ed.2d 20 (1966). *Ashley, Drew* teaches that Norris-LaGuardia's anti-injunction provisions cannot be reasonably applied without looking at both the character of the parties and the subject matter of the dispute. Id. at 1365. After reviewing a long line of precedents, the Eighth Circuit concluded that

it is reasonable to conclude that Section 13(a) [of Norris-LaGuardia, 29 U.S.C. 113(a)] was meant to preclude injunctive interference with bargaining or organizing on an industry-wide or craft-wide basis. It was not meant to extend an anti-injunctive shield to union activities beyond the place where the union's interest in a labor dispute ceases."

*Ashley, Drew* at 1366.

In order to fall within the scope of Norris-LaGuardia's anti-injunction provisions, the union must show that the picketed company is substantially aligned with the company involved in the underlying labor dispute. In the case before us, BMWE has shown no substantial alignment between RF & P and the Maine Central. The district court twice found that the RF & P is "a neutral." I would adopt the reasoning of *Ashley, Drew* and would allow federal court intervention under the facts of this case. I think application of the Norris-LaGuardia Act is inappropriate here because the picketing of RF & P's yards does not involve or arise out of the only possible labor dispute in this record: the dispute between the BMWE and the Maine Central in Maine.

Because the RF & P is not substantially aligned with the Maine Central and has no dispute with Maine Central, labor or otherwise, I would reverse the order of the district court declining to enjoin picketing at railway facilities having no connection whatsoever with the labor dispute in Maine.

The requirements of time (this dissent is transmitted by facsimile to our clerk's office for filing) prevent a more extended discussion of this most interesting and close question. In this respect, I should add that I especially rely upon the reasoning, as did *Ashley, Drew* to some extent, in the treatise *Labor and the Law*, Gregory & Katz (3d ed.) Ch. VII, especially p. 184, et seq.